COMMONWEALTH *vs.* MATT H. ZUBIEL.

Plymouth. December 8, 2009. - February 5, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Obscenity,* Dissemination of matter harmful to minor. *Words,* "Matter."

This court ordered entry of judgments for the criminal defendant on indictments charging him with attempted dissemination of matter harmful to a minor, in violation of G. L. c. 272, § 28, where the electronically transmitted text that comprised the defendant's Internet conversations with someone whom he thought was a thirteen year old girl (actually, an undercover police officer) did not qualify as "matter" as defined in G. L. c. 272, § 31, in that such text was neither a visual representation [30-31] nor handwritten or printed material [32-33].

INDICTMENTS found and returned in the Superior Court Department on May 26, 2006.

The cases were heard by *Charles M. Grabau,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Thomas C. Foley* for the defendant.

*Kristin Freeman,* Assistant District Attorney, for the Commonwealth.

SPINA, J. After a jury-waived trial, Matt H. Zubiel was convicted on four indictments alleging an attempt to disseminate matter harmful to a minor, under G. L. c. 272, § 28, and as defined in G. L. c. 272, § 31.[1] He moved for required findings of not guilty at the close of the Commonwealth's case and again at the close of the evidence. The motions were denied. Zubiel appealed from his convictions, and we transferred the case to this court on our own motion.

We are asked to decide whether Zubiel was entitled to required

[1]Each indictment was based on Internet conversations between Zubiel and an undercover police officer on a specific day, February 8, 13, 14, and 15, 2006, respectively.

findings of not guilty on the ground that the definition of "matter," as defined in G. L. c. 272, § 31, does not encompass electronically transmitted text, or "online conversations," for the purposes of a prosecution for attempted dissemination of matter harmful to a minor under G. L. c. 272, § 28. We hold that it does not, and reverse Zubiel's convictions.

1. *Facts.* The judge could have found the following facts. See *Commonwealth* v. *Latimore,* 378 Mass. 671, 677-678 (1979). Deputy Sheriff Melissa Marino, a member of the "high-tech evidence analysis team" in the Plymouth County sheriff's department, conducted undercover online investigations of crimes in the Commonwealth, including child pornography and child enticement.

As part of her standard procedure in investigations, Marino created an undercover screen name, "Melissa QT 1995," and set up a profile on Yahoo, a Web site that provides public Internet discussion and private online conversations, describing herself as "Meliss Smith" from the South Shore, age thirteen, and in the eighth grade. In her profile, she invited others in the general discussion to "PM" her if they would like to send her a "private message." These online conversations are also known as "instant messaging."[2]

On February 8, 2006, Marino entered the public discussion and waited for someone to approach her and engage in conversation. She was eventually approached by someone with a screen name of "Ilikesports04," who said, "Hi, how are you?" This was later determined to be Zubiel. Marino informed Zubiel that she was thirteen years old, and he told her he was twenty-five years old. The online conversation between Zubiel and Marino was a private instant message, only seen by the two parties.

During the first online conversation, which lasted forty-two minutes, Zubiel asked Marino for a photograph, so she sent, via electronic mail message (e-mail), photographs of herself when she was thirteen years old. They discussed where each other lived and gave physical descriptions of themselves. Zubiel asked

---

[2]The "instant messages" in this case were electronically transmitted text, between two individuals, utilizing Yahoo, a Web site that provides instant messaging services. During an "instant message," the text an individual types goes instantaneously to the other person's computer via the Internet, creating a private online conversation.

Marino, "[You] ever fool around with boys?" and other questions regarding what she had done with boys, how old the boys were, and additional details about those events.

Their second online conversation occurred on February 13, 2006, during which Zubiel brought up several intimate topics. He asked questions about her physical appearance and her sexual experience. He asked her to send a photograph of herself nude, but she declined. Zubiel also asked Marino if she was a police officer and acknowledged that they could get in trouble for what they talk about. The following day, February 14, 2006, Zubiel sent Marino a photograph of himself via e-mail. They again discussed, in an online conversation, sexual topics, and Marino informed Zubiel that her mother would be working that weekend and she would be home alone. Zubiel again questioned Marino on her sexual history, and told her that he would like to visit and that he "would teach [her] everything."

On February 15, 2006, they had another online conversation regarding Zubiel's potential visit to Marino. They also spoke on the telephone that day, as Zubiel wanted to make sure Marino was not a police officer. They again discussed sexual topics, and Zubiel said to Marino, "I will show you the right way."

On February 17, 2006, they had a final online conversation. Subsequently, Marino telephoned Zubiel at his request, and he told her he would visit her the next day. Marino told him that she lived in an apartment complex in Marshfield. The next day, February 18, 2006, he telephoned her as he was entering Marshfield to ask for directions. When Zubiel arrived at the apartment complex, the police arrested him as he was walking toward the apartment building.

Following his arrest, Zubiel admitted that his "screen name" was "Ilikesports04," and that he had conducted all of the online conversation with Marino. He also admitted to the police that "it was a possibility that he would have sex with this girl if — if, indeed, she was a real girl, and that the thought was there for him to have sex with this minor." Zubiel gave the police permission to seize his computer. A forensic examination of the computer revealed searches for Marshfield High School, directions to the apartment complex, the profile page of "Melissa QT 1995," the photographs that Marino and Zubiel sent to each other, as well as portions of the online conversations.

2. *Standard of review.* When reviewing a judge's denial of a motion for a required finding of not guilty, we assess the evidence in the light most favorable to the Commonwealth to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Commonwealth* v. *Latimore, supra.*

3. *Online conversations as "matter" under G. L. c. 272, § 31.* General Laws c. 272, § 28, provides: "Whoever disseminates to a minor any matter harmful to minors, as defined in section thirty-one, knowing it to be harmful to minors, or has in his possession any such matter with the intent to disseminate the same to minors, shall be punished . . . ." "Matter" is defined in G. L. c. 272, § 31, for purposes of G. L. c. 272, §§ 28-30D,[3] as "any handwritten or printed material, visual representation, live performance or sound recording including but not limited to, books, magazines, motion picture films, pamphlets, phonographic records, pictures, photographs, figures, statues, plays, dances."

Online electronically transmitted conversations are not explicitly included in the definition of "matter" under § 31. Penal statutes must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Commonwealth* v. *Twitchell,* 416 Mass. 114, 123 (1993), quoting *Kolender* v. *Lawson,* 461 U.S. 352, 357 (1983). Therefore, criminal statutes are strictly construed against the government. *Commonwealth* v. *Richards,* 426 Mass. 689, 690 (1998).

a. *Visual representations.* There are four broad categories of "[m]atter:" (1) any handwritten or printed material; (2) any visual representation; (3) any live performance; and (4) any sound recording. G. L. c. 272, § 31. The Commonwealth argues that the computer text was a visual representation. Zubiel contends that the online conversations between himself and Marino were not "visual representation[s]," as the term "visual representation" in § 31 refers to photographs and other images, but not text. We agree.

General Laws c. 272, § 31, does not define "visual representation." However, it does define "[v]isual material," listing numer-

---

[3]The definitions appearing in G. L. c. 272, § 31, govern §§ 28, 28C, 28D, 28E, 29, 29A, 29B, 30, and 30D of G. L. c. 272.

ous specific media that are considered "visual material" under the statute.[4] When elements are listed in a series, the rules of statutory construction require the general phrase to be construed as restricted to elements similar to the specific elements listed. *Santos* v. *Bettencourt*, 40 Mass. App. Ct. 90, 92 (1996). This principle, ejusdem generis, "allow[s] the specific words to identify the class and [restricts] the meaning of general words to things within the class." 2A N.J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 47.17, at 379 (7th ed. 2007).

Here, the specific elements listed as "[v]isual material" are limited to the class of *pictures* — moving or still, whether on paper, film, or computer. The statute indicates nowhere an intent by the Legislature to include words, such as those used in online conversations, in this definition.

In addition, the use of the phrase "visual representations" in the definition of "[v]isual material" provides insight into the definition of "visual representation." The definition of "[v]isual material" includes "pictures, photographs or similar visual representations." The inclusion of "similar visual representations" following the words "pictures" and "photographs" indicates that it refers to images, not purely written words.

Because the statute provides no definition of "visual representation," this court must interpret the words of the statute according to their usual and accepted meaning. *Commonwealth* v. *O'Keefe*, 48 Mass. App. Ct. 566, 567 (2000). No Massachusetts court has defined "visual representation" to include pure text, such as the online conversations in this case.[5] The ordinary meaning of "visual representation" does not include purely textual material. Accordingly, we hold that the Legislature did not intend online conversation to be considered as "visual representation" under § 31.

---

[4] "'Visual material', any motion picture film, picture, photograph, videotape, book, magazine, pamphlet that contains pictures, photographs or similar visual representations or reproductions, or depiction by computer. Undeveloped photographs, pictures, motion picture films, videotapes and similar visual representations or reproductions may be visual materials notwithstanding that processing, development or similar acts that may be required to make the contents thereof apparent." G. L. c. 272, § 31.

[5] The Commonwealth has not directed our attention to any reported case where the term "visual representation" includes purely textual materials, and we have not found any such case.

b. *Handwritten or printed material.* Zubiel next argues that the instant messages do not fall under the statute's prohibition of dissemination of "handwritten or printed material" under G. L. c. 272, § 31.[6] We agree.

The online conversations in this case were not handwritten. While there is no statutory definition of "handwritten" materials, in the absence of such definition, "we give [the words] their usual and accepted meanings, as long as these meanings are consistent with the statutory purpose. . . . We derive the words' usual and accepted meanings from sources presumably known to the statute's enactors, such as their use in other legal contexts and dictionary definitions." (Citations omitted.) *Commonwealth* v. *Zone Book, Inc.*, 372 Mass. 366, 369 (1977).

The relevant definition of the word "write" is "to form or trace (a character or series of characters) on paper or other suitable material *with a pen or pencil*" (emphasis added). Webster's Third New Int'l Dictionary 2640 (1993). In *Commonwealth* v. *O'Keefe, supra* at 568, the Appeals Court, in distinguishing printed from handwritten material, defined "handwritten material." The Appeals Court determined that handwriting is what it is commonly understood to be: writing performed by hand with a pen or pencil, as distinguished from print, which is "mechanically produced."[7] *Id.* at 568 & n.4.

In light of the *O'Keefe* decision and the Legislature's subsequent amendment of the statute to include "handwritten" materials in the definition of "[m]atter" in § 31, we conclude that the online conversations in this case, as they were not written with pen or pencil, cannot be considered "handwritten" materials under § 31.

The remaining issue is whether the instant messages in this case are "printed material" under § 31. Again, because there is no definition of "printed materials" in § 31, we look to the usual and accepted meaning of the words, from sources presum-

---

[6] The Commonwealth argued below that online conversations were both "printed material" and "handwritten material" under § 31. They do not make that argument on appeal.

[7] At the time *Commonwealth* v. *O'Keefe*, 48 Mass. App. Ct. 566 (2000), was decided, G. L. c. 272, § 31, did not define "[m]atter" to include "handwritten" materials, as it does now. In 2002, the Legislature amended § 31 to include "handwritten" materials. St. 2002, c. 161, § 1. This fact does not affect the applicability of the *O'Keefe* decision to this case.

ably known to the Legislature at the time the statute was enacted. *Commonwealth* v. *Zone Book, Inc., supra.*

Webster's Third New Int'l Dictionary, *supra* at 1803, defines the verb "print" as "to make a copy of *by impressing paper against an inked printing surface* or by an analogous method" (emphasis added). Here, Zubiel electronically transmitted text, which did not involve the impression of paper against an inked printing surface, and did not cause any mechanically produced text to be printed on paper. Because criminal statutes must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited," *Commonwealth* v. *Twitchell,* 416 Mass. 114, 123 (1993), and any ambiguity in such statutes must be strictly construed against the government, *Commonwealth* v. *Richards,* 426 Mass. 689, 690 (1998), we cannot hold that electronically transmitted text falls within the definition of "printed material."

In addition, we consider the underlying legislative intent. The earlier intent of the statute was to focus on commercial distributors of obscene material. See *Commonwealth* v. *O'Keefe, supra* at 571. However, recent additions to the obscenity statutes have criminalized noncommercial behavior, indicating a legislative intent to protect children from sexual exploitation and abuse. See G. L. c. 272, § 29C, inserted by St. 1997, c. 181, § 2 (criminalizing possession of obscene visual depictions of children). See also *Commonwealth* v. *Hinds,* 437 Mass. 54, 64 (2002), cert. denied, 537 U.S. 1205 (2003) ("Our reading comports with the Legislature's expressed design to eliminate permanent records of sexually exploitive material harmful to children").[8] While proscribing the activity in this case would be consistent with a legislative intent to protect children from sexual abuse and exploitation, the definitions in § 31 do not do so. If the Legislature wishes to include instant messaging or other electronically transmitted text in the definition of "[m]atter" under § 31, it is for the Legislature, not the court, to do so.

*Judgments for the defendant.*

---

[8]The Legislature considered amending G. L. c. 272, § 31, in 2000 to include computer-generated writing, whether printed or electronically transmitted, but to date, has not acted so. See 2000 Senate Doc. No. 2147.