NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11821

COMMONWEALTH  vs.  TYSHAUN McGHEE
(and seven companion cases[1]).


Suffolk.     April 6, 2015. - August 13, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.


Exploitation of People.  Trafficking.  Deriving Support from
     Prostitution.  Statute, Validity, Construction.  Due
     Process of Law, Vagueness of statute.  Constitutional Law,
     Vagueness of statute, Freedom of association.  Grand Jury.
     Witness, Cross-examination, Impeachment, Bias.  Evidence,
     Cross-examination, Testimony before grand jury, Impeachment
     of credibility, Bias, Prior misconduct, Sexual conduct.
     Rape-Shield Statute.  Practice, Criminal, Grand jury
     proceedings, Transcript of testimony before grand jury,
     Assistance of counsel, Confrontation of witnesses,
     Sentence.  Words, "Commercial sexual activity."



     Indictments found and returned in the Superior Court
Department on December 19, 2012.

     The cases were tried before Diane M. Kottmyer, J.

     The Supreme Judicial Court granted an application for
direct appellate review.

---

     [1] Four against Tyshaun McGhee and three against Sidney
McGee.  Because the last names of the defendants are so similar,
we refer to each one individually by his first name.

Sharon Dehmand for Tyshaun McGhee.
David M. Jellinek for Sidney McGee.
Matthew T. Sears, Assistant District Attorney, for the Commonwealth.
The following submitted briefs for amici curiae:
Amy Farrell, pro se.
Maura Healey, Attorney General, & Susanne G. Reardon, Assistant Attorney General, for the Attorney General.
Julie Dahlstrom, Felicia H. Ellsworth, Tasha Bahal, & Michelle L. Sandals for Ascentria Care Alliance & others.

SPINA, J.  In this case, we are asked to consider, for the first time, the constitutionality of the Massachusetts sex trafficking statute.  On November 21, 2011, the Legislature approved "An Act relative to the commercial exploitation of people," which criminalized sexual servitude, forced labor, and organ trafficking as of its effective date of February 19, 2012. St. 2011, c. 178, §§ 1-31.  The portions of the enactment at issue here, pertaining to the trafficking of persons for sexual servitude, were codified at G. L. c. 265, §§ 49, 50.  See St. 2011, c. 178, § 23.

General Laws c. 265, § 50 (a), states, in relevant part:

> "Whoever knowingly:  (i) subjects, or attempts to subject, or recruits, entices, harbors, transports, provides or obtains by any means . . . another person to engage in commercial sexual activity . . . or causes a person to engage in commercial sexual activity . . . or (ii) benefits, financially or by receiving anything of value, as a result of a violation of clause (i), shall be guilty of the crime of trafficking of persons for sexual servitude and shall be punished by imprisonment in the state prison for not less than [five] years but not more than [twenty] years and by a fine of not more than $25,000."

The phrase "[c]ommercial sexual activity" is defined as "any sexual act on account of which anything of value is given, promised to or received by any person."  G. L. c. 265, § 49.

On December 19, 2012, a Suffolk County grand jury indicted each defendant, Tyshaun McGhee and Sidney McGee, on nine counts of aggravated rape, G. L. c. 265, § 22 (a), three counts of trafficking persons for sexual servitude, G. L. c. 265, § 50, and two counts of deriving support from the earnings of a prostitute, G. L. c. 272, § 7.  The charges arose from allegations by three women (C.C., S.E., and B.G.[2]) that the defendants approached them, took their photographs to post as advertisements on a Web site called Backpage.com, drove them to various locations to have sex with men who responded to the advertisements, and then retained some or all of the money that the women received as payment from these men.  The defendants filed a joint pretrial motion to dismiss the sex trafficking charges on the grounds that G. L. c. 265, § 50, is unconstitutionally vague and overbroad, both on its face and as applied to them.  A judge of the Superior Court denied the motion.  Following a jury trial, Tyshaun was convicted on all

---

[2] The full names of C.C., S.E., and B.G. have been omitted in accordance with G. L. c. 265, § 24C (requiring confidentiality of name of victim in arrest, investigation, or complaint for rape under G. L. c. 265, § 22, or for trafficking of persons under G. L. c. 265, § 50).

three indictments charging him with trafficking persons for sexual servitude (C.C., S.E., and B.G.),[3] and both indictments charging him with deriving support from the earnings of a prostitute (C.C. and S.E.).  He was found not guilty on the indictments charging him with aggravated rape.  Sidney was convicted on all three indictments charging him with trafficking persons for sexual servitude (C.C., S.E., and B.G.),[4] and he was found not guilty on the remaining indictments.  Each defendant filed a timely notice of appeal, and we granted their subsequent applications for direct appellate review.

The defendants contend on appeal that (1) G. L. c. 265, § 50, is unconstitutionally vague as applied to them and, therefore, violated their rights to due process under the Fifth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights; (2) G. L. c. 265, § 50, is unconstitutionally overbroad on its face in violation of their right to freedom of association under the First Amendment to the United States Constitution; (3) the

---

[3] As to C.C. and S.E., Tyshaun's convictions of trafficking persons for sexual servitude were based on the theories set forth in G. L. c. 265, § 50 (a) (i) and (ii).  As to B.G., Tyshaun's conviction was based only on the theory set forth in G. L. c. 265, § 50 (a) (i).

[4] Sidney's convictions of trafficking persons for sexual servitude were all based on the theory set forth in G. L. c. 265, § 50 (a) (i).

phrase "commercial sexual activity" is unconstitutionally overbroad; (4) the judge erred in allowing the substantive admission of grand jury testimony from one of the Commonwealth's witnesses; and (5) the judge violated their right to confrontation by hindering their cross-examination of C.C. with respect to several pending criminal charges against her and her purported history of prostitution.  In addition, Tyshaun contends that the sentences imposed for his convictions of deriving support from the earnings of a prostitute were illegal. For the reasons that follow, we conclude that G. L. c. 265, § 50, is constitutional, that the sentences challenged by Tyshaun were illegal, and that the defendants' remaining claims of error have no merit.  Accordingly, the judgments are affirmed.  As to the indictments charging Tyshaun with deriving support from the earnings of a prostitute, those cases are remanded for resentencing in accordance with this opinion.[5]

1.  Factual background.  We summarize the facts the jury could have found, reserving certain details for our discussion of the issues raised.  As mentioned, the charges against the defendants arose from their interactions with three women in the

---

[5] We acknowledge the amicus briefs submitted by Ascentria Care Alliance, Coalition Against Trafficking in Women, Children's Advocacy Center of Suffolk County, Demand Abolition, Eva Center and My Life My Choice; and by the Attorney General. We also acknowledge the amicus letter submitted Amy Farrell, Ph.D.

fall of 2012.[6]  C.C., then approximately twenty-four years old, had a history of drug and alcohol use, and she had spent time in several treatment facilities.  On September 7, 2012, as she left Boston Medical Center after having been treated for two drug overdoses within one twenty-four hour period, she encountered the defendants, who were standing outside the hospital.  The defendants asked C.C. what she was doing, and she told them that she was interested in "party[ing]."  After offering to give her a ride, the defendants walked C.C. to an apartment on Eustis Street in Boston, where C.C. observed an older man standing outside.  Tyshaun gave the man some money, and then Tyshaun proceeded inside with C.C. and Sidney.  They went upstairs to a bedroom where all three drank from a bottle of alcohol, C.C. smoked some "crack" cocaine that had been given to her by Tyshaun, and the defendants purportedly raped C.C. as she cried.[7] Afterward, C.C. got dressed, all three individuals walked to an apartment on Dudley Street where Tyshaun's mother lived, and C.C. fell asleep on a couch.  She did not attempt to run away because she was afraid of what might happen to her.

---

[6] One of the three women, B.G., was not a witness at the defendants' trial.  The other two women, C.C. and S.E., did testify.

[7] Given that the defendants were found not guilty of the indictments charging aggravated rape, we need not discuss the details of C.C.'s testimony pertaining to these charges.

The next morning, the defendants and C.C. walked to a fast food restaurant where Tyshaun purchased some heroin from a friend and gave it to C.C., who proceeded to inject it into her foot.  As they walked away from the restaurant, the defendants started talking with C.C. about a business arrangement whereby she could "make a lot of money," "have a nice car," and "have a nice apartment."  It was C.C.'s understanding that the defendants were talking about prostitution.  They continued this conversation until they reached the Dudley Street apartment.

At the apartment, the defendants prepared to take photographs of C.C., which they planned to post as advertisements on the Web site Backpage.com.  Tyshaun told C.C. that there would be a "rate," which she understood as meaning that she would be having sex with people in exchange for money. Although "definitely hesitant," C.C. agreed to proceed because she was "broke and homeless, and having a nice apartment and car and money seemed like the best option."  Tyshaun gave C.C. lingerie to wear, and he took photographs of her with a digital camera in the bathroom of the apartment.  C.C. started feeling "uncomfortable" and did not want to be in the situation in which she found herself.  Nonetheless, the defendants transferred the photographs to Sidney's laptop computer and then posted them on Backpage.com.  Tyshaun included his cellular telephone number

with the photographs, and the name indicated on them was "Jamie Lynn."

After about thirty minutes, Tyshaun's telephone started to ring. He answered it and handed the telephone to C.C., having told her what to say to the callers. C.C. would ask them "if they were a cop of any sort," what they wanted, and whether they could meet at a particular location that had been chosen by Tyshaun and Sidney. Tyshaun established prices of one hundred dollars for thirty minutes of sex, and $150 for one hour of sex. When C.C. arranged to meet a man at the Eustis Street apartment for thirty minutes of sex, the defendants walked with her to that location, and Tyshaun again gave some money to the same older man who had been standing outside that location the previous day. C.C. was directed to a room, she had sex with the man she had arranged to meet, she was paid one hundred dollars, and she handed the money over to Tyshaun, keeping none of it for herself.

Over the course of the next three to four days, C.C. had sex with five or six other men in various locations. The defendants always accompanied C.C. to the designated meeting place and would wait for her until she had finished. She gave all of the money that she was paid to Tyshaun, who arranged the accommodations. At some point, Tyshaun stopped providing drugs

and alcohol to C.C., telling her that she was not making enough money to support her habits.

On September 12, 2012, roughly five days after having met the defendants, C.C. woke up alone in a hotel room. Although neither defendant was there, Tyshaun's cellular telephone was in the room. C.C. telephoned her father. He told her to leave the hotel room, and she jogged to a nearby pharmacy, where she telephoned her father again to pick her up. On the drive to her parents' home, C.C. told her father in response to his questioning that she had been raped. After she arrived home, C.C.'s mother took her to Brockton Hospital where she was interviewed by a sexual assault nurse examiner and diagnosed with pneumonia and cellulitis. During her examination, C.C. told the nurse that over the past several days she had engaged in sex with multiple men. At some point shortly thereafter, C.C. told Boston police officers that she had been sexually assaulted, but she did not disclose her involvement in prostitution. On October 2, 2012, C.C. was shown a photographic array, and she identified the photograph of Sidney. Approximately one month later, C.C. told the police about her involvement with prostitution. On December 12, 2012, C.C. went to Boston police headquarters to view a live lineup, and she identified Tyshaun.

In the fall of 2012, S.E., then approximately twenty-six years old, was homeless, and had a history of drug use.  S.E. met Sidney around September 18, when she was standing in line outside a homeless shelter near the Boston Medical Center. After asking S.E. several questions, Sidney told her that he could help her, and that she could earn enough money working as an "escort" to live a better life.  S.E. accompanied Sidney to meet Tyshaun, and then the three of them went to the apartment on Dudley Street where Tyshaun's mother lived.  Once there, the defendants told S.E. that they were going to take photographs of her and post them on the Web site Backpage.com.  S.E. agreed, but "wasn't comfortable" with the arrangement.  Tyshaun took the photographs using his cellular telephone, Sidney showed her how to pose, and the defendants posted the photographs online. Tyshaun included his cellular telephone number with the photographs, and the name indicated on them was "Natalia."

After a short period of time, calls and text messages started arriving on Tyshaun's telephone.  S.E. realized that Tyshaun was conversing about sex, not merely escorting, only when she questioned him about the prices for her "services." Tyshaun told the callers that it would be $150 for "full service," which meant oral and vaginal sex, and fifty dollars for just oral sex.  Shortly thereafter, a man arrived at the Dudley Street apartment, he and S.E. "engaged in sexual

behavior," the man paid her some cash, and she gave it to Tyshaun so he could "put gas in the car," "rent a hotel room," and "keep posting the ad."  S.E. subsequently met another individual at a different location that was a few blocks away from the Dudley Street apartment.  She was unable to remember what happened at this second location.  S.E. returned to the Dudley Street apartment with the defendants at around 3 A.M., she performed oral sex on each defendant at their behest because she "didn't want to get hurt," she had sexual intercourse with Tyshaun, and then the defendants fell asleep.

The next morning, after the defendants took S.E. to a methadone clinic, they proceeded to check Tyshaun's telephone for responses to the photographs they had posted on Backpage.com.  Over the next twenty-four hours, the defendants drove S.E. to different locations where she engaged in various sexual acts with several different men.  The defendants always remained nearby in their parked motor vehicle and, once S.E. had finished, Tyshaun demanded all of the cash that she had received.

On her third day with the defendants, Tyshaun again took S.E. to a methadone clinic where she chatted with B.G., a woman she had met during prior visits to the clinic.  After their conversation, B.G. went outside and spoke with the defendants, whom she already had met.  Eventually, all four of them returned

to the Dudley Street apartment, where B.G. used a computer to repost photographs of herself that had been submitted to Backpage.com on an earlier occasion.  The defendants also took new photographs of B.G. and posted them on the Web site.  Later that same day, the defendants drove S.E. and B.G. some distance to a hotel where each woman had sex with two men for money.  The defendants waited outside in their car.  S.E. and B.G. received $250, which was split evenly, and S.E. gave her share to Tyshaun when he asked for it.  B.G. kept some, if not all, of the money she had received.  Eventually, the group drove back to Boston.  Tyshaun and B.G. had an argument about sex and money; Tyshaun pulled the vehicle over to the side of the road, and the women got out.  B.G. removed some personal belongings from the trunk, and the two women walked away.  The defendants drove off.

S.E. and B.G. went to Boston Medical Center, and the police were called to the scene.  In the waiting room, the women met with Officer Edward Fleming and told him that they had been forced into prostitution.  Boston police officers subsequently interviewed S.E. and B.G. regarding the events that had transpired with the defendants.  On September 26, 2012, S.E. went to a police station to view a photographic array.  She identified Tyshaun, and he was arrested the next day.  On September 28, 2012, S.E. returned to the police station to view

another photographic array.  She identified Sidney, and he was arrested that same day.

2.  Constitutionality of G. L. c. 265, § 50.  We begin with a discussion of the defendants' facial and as-applied challenges to the constitutionality of the sex trafficking statute, which challenges present questions of law that we review de novo.  See Commonwealth v. Johnson, 470 Mass. 300, 307 (2014), citing Commonwealth v. Martin, 467 Mass. 291, 301 (2014).  In accordance with canons of statutory construction, a statute is presumed to be constitutional.  See St. Germaine v. Pendergast, 416 Mass. 698, 703 (1993).  "Doubts as to a statute's constitutionality 'should be avoided if reasonable principles of interpretation permit doing so.'"  Commonwealth v. Disler, 451 Mass. 216, 228 (2008), quoting Staman v. Assessors of Chatham, 351 Mass. 479, 487 (1966).

The defendants first contend that G. L. c. 265, § 50 (a), is unconstitutionally vague as applied to them and, therefore, violated their rights to due process under the Fifth and Fourteenth Amendments and art. 12.  They point out that § 50 (a) lacks the element of force or coercion as required by the analogous Federal sex trafficking statute, 18 U.S.C. § 1591(a)

(2012).[8] As such, the defendants argue that § 50 (a) fails to give them fair warning of prohibited conduct, noting that by merely assisting a consenting adult prostitute, they will be deemed to have engaged in the trafficking of persons for sexual servitude. Moreover, the defendants continue, without the element of force or coercion, there is a real risk of arbitrary enforcement of the statute, which also offends standards of due process.[9] We disagree with the defendants' arguments.

---

[8] The Trafficking Victims Protection Act of 2000, Pub. L. 106-386, § 112, 114 Stat. 1464, 1487, codified at 18 U.S.C. § 1591 (2012), provides, in relevant part:

"(a)  Whoever knowingly --

"(1) in or affecting interstate or foreign commerce . . . recruits, entices, harbors, transports, provides, obtains, or maintains by any means a person; or

"(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b)."

We point out that the omission of language from G. L. c. 265, § 50 (a), that is included in the previously enacted analogous Federal statute "reflect[s] a conscious decision by the Legislature to deviate from the standard embodied in the Federal statute." Globe Newspaper Co. v. Boston Retirement Bd., 388 Mass. 427, 433 (1983).

[9] By way of example, the defendants suggest that G. L. c. 265, § 50 (a), as written, permits the Commonwealth to

The principles governing a vagueness challenge to a statute are well established. "A basic tenet of due process requires that a criminal statute be sufficiently clear to give notice of the prohibited conduct." Commonwealth v. Reyes, 464 Mass. 245, 248 (2013). See Commonwealth v. Bohmer, 374 Mass. 368, 371 (1978). "A statute violates due process and is void for vagueness when individuals of normal intelligence must guess at the statute's meaning and may differ as to its application, thus denying them fair notice of the proscribed conduct." Disler, 451 Mass. at 223. See Connally v. General Constr. Co., 269 U.S. 385, 391 (1926). "Penal statutes must 'define the criminal offense with sufficient definitiveness that ordinary people can understand what conduct is prohibited.'" Commonwealth v. Zubiel, 456 Mass. 27, 30 (2010), quoting Commonwealth v. Twitchell, 416 Mass. 114, 123 (1993). See Kolender v. Lawson, 461 U.S. 352, 357 (1983). A vague statute also offends due process because of "its lack of reasonably clear guidelines for law enforcement and its consequent encouragement of arbitrary and erratic arrests and prosecutions." Commonwealth v. Sefranka, 382 Mass. 108, 110 (1980). See Reyes, supra at 249. See also Grayned v. Rockford, 408 U.S. 104, 108-109 (1972). Any

---

decline to prosecute a taxicab driver who transports a known prostitute to an appointment to engage in commercial sexual activity, but to prosecute the defendants who provide the same service.

ambiguity in a criminal statute "must be strictly construed against the government." Zubiel, supra at 33. See Commonwealth v. Kenney, 449 Mass. 840, 850 (2007).

"Proscribed conduct, however, is not always capable of precise legal definition." Reyes, 464 Mass. at 249. See Jaquith v. Commonwealth, 331 Mass. 439, 442 (1954). "Accordingly, legislative language need not be afforded 'mathematical precision' in order to pass constitutional muster." Reyes, supra, quoting Bohmer, 374 Mass. at 372. See Grayned, 408 U.S. at 110. A statute is not vague "if it requires a person to conform his conduct to an imprecise but comprehensible normative standard." Commonwealth v. Orlando, 371 Mass. 732, 734 (1977). Its language will be constitutionally adequate if it "conveys [a] sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." Commonwealth v. Adams, 389 Mass. 265, 270 (1983), quoting Commonwealth v. Jarrett, 359 Mass. 491, 496-497 (1971). "Uncertainty as to whether marginal offenses are included within the coverage of a statute does not render it unconstitutional if its scope is substantially clear." Reyes, supra. See United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, AFL-CIO, 413 U.S. 548, 579 (1973); Jarrett, supra. Moreover, "even a vague statute may be made

constitutionally definite by giving it a reasonable construction." Sefranka, 382 Mass. at 111.

Here, we conclude that because G. L. c. 265, § 50 (a), is sufficiently clear and definite, it did not violate the defendants' rights to due process under the Fifth and Fourteenth Amendments and art. 12. The words of the statute have commonly accepted and readily understood meanings in the English language, and the phrase "commercial sexual activity" is amply defined in G. L. c. 265, § 49.[10] The statutory language provided fair notice to the defendants that the very conduct in which they engaged was the kind of conduct that the Legislature intended to prohibit and punish.

The fact that G. L. c. 265, § 50 (a), does not include the element of force or coercion does not render the statute unconstitutionally vague or subject to arbitrary enforcement. The clear and deliberate focus of the statute is the intent of the perpetrator, not the means used by the perpetrator to accomplish his or her intent. Section 50 (a) states that an individual shall be guilty of the crime of trafficking of persons for sexual servitude where such individual "knowingly . . . subjects, or attempts to subject, or recruits, entices, harbors, transports, provides or obtains by any means . . .

_____

[10] Our conclusion that the definition of "commercial sexual activity" is not unconstitutionally overbroad will be discussed in a subsequent portion of this opinion.

another person to engage in commercial sexual activity"
(emphasis added).  As is its purview, the Legislature has
determined that whether a person being trafficked for sexual
servitude has been forced or coerced into engaging in such
activities is immaterial for purposes of ascertaining whether a
criminal act has been committed.  The only relevant
consideration is whether the perpetrator has engaged in the
enumerated proscribed conduct with the requisite mens rea.

When used in a criminal statute, the word "knowingly"
typically "imports a perception of the facts requisite to make
up the crime."  Commonwealth v. Altenhaus, 317 Mass. 270, 273
(1944), quoting Commonwealth v. Horsfall, 213 Mass. 232, 237
(1913).  A requirement of scienter "has a tendency to narrow
(and thus to clarify) the scope of a criminal enactment."
Commonwealth v. Love, 26 Mass. App. Ct. 541, 546 n.11 (1988).
The Supreme Court has long recognized that the constitutionality
of a purportedly vague statute "is closely related to whether
that [statute] incorporates a requirement of mens rea."
Colautti v. Franklin, 439 U.S. 379, 395 (1979).  See Hill v.
Colorado, 530 U.S. 703, 732 (2000) (rejecting vagueness
challenge premised on failure of statute to provide people of
ordinary intelligence with reasonable opportunity to understand
prohibited conduct where statute contained requirement of
scienter); Screws v. United States, 325 U.S. 91, 102 (1945)

(plurality opinion) ("where the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law").

The language of G. L. c. 265, § 50 (a), requiring the knowing commission of specified acts for the purpose of enabling or causing another person to engage in commercial sexual activity defines with sufficient clarity the prohibited conduct. As a consequence, the statute provides comprehensible standards for law enforcement that discourage arbitrary arrests and prosecutions. What the defendants characterize as "merely assisting" an adult consenting prostitute will still constitute the crime of sex trafficking in those circumstances where all of the statutory elements have been satisfied. The absence of any element, notably mens rea, will negate criminality. In this case, the defendants' actions fell squarely within the conduct unambiguously proscribed by G. L. c. 265, § 50 (a).

Contrary to the defendants' contentions, G. L. c. 265, § 50 (a), does not simply criminalize and punish more harshly the same conduct already prohibited by G. L. c. 272, § 7. The substantive differences between the two statutes are evident and meaningful. Therefore, the defendants' arguments that they

could not have known that their so-called "pimping" activities would constitute sex trafficking are unavailing.

General Laws c. 272, § 7, provides, in relevant part, that "[w]hoever, knowing a person to be a prostitute, shall live or derive support or maintenance, in whole or in part, from the earnings or proceeds of his prostitution . . . shall be punished by imprisonment in the state prison for a period of five years and by a fine of [$5,000]." We have explained that "[a] conviction of deriving support from the earnings of a prostitute requires the jury to find that a particular individual was a prostitute, that the defendant knew that the individual was a prostitute, and that the defendant shared in some way in the earnings or proceeds of this person's prostitution." Commonwealth v. Purdy, 459 Mass. 442, 454 n.10 (2011).

The differences in the conduct prohibited by G. L. c. 272, § 7, and by G. L. c. 265, § 50 (a), are primarily twofold. First, the language of G. L. c. 272, § 7, plainly states that the conduct prohibited by that statute is the sharing of proceeds earned by a known prostitute. In contrast, under G. L. c. 265, § 50 (a), an individual who knowingly enables or causes another person to engage in commercial sexual activity need not benefit, either financially or by receiving something of value, from such conduct in order to be convicted of sex trafficking. Indeed, as Sidney points out, he was found not guilty of

violating G. L. c. 272, § 7, presumably because the evidence was insufficient to prove beyond a reasonable doubt that he shared in the money earned by C.C., S.E., and B.G. However, his commission of acts proscribed by G. L. c. 265, § 50 (a), resulted in his convictions of sex trafficking. Second, the knowledge element of G. L. c. 272, § 7, is retrospective. That is to say, an individual shares earnings or proceeds knowing that they came from an act of prostitution that already has occurred. In contrast, the knowledge element of G. L. c. 265, § 50 (a), is prospective. An individual engages in statutorily enumerated acts knowing that those acts will result in another person's anticipated engagement in commercial sexual activity. Although it may appear to the defendants that G. L. c. 272, § 7, and G. L. c. 265, § 50 (a), criminalize essentially the same misconduct, they plainly do not. Therefore, the defendants had fair warning that their so-called "pimping" activities could subject them to prosecution for deriving support from the earnings of a prostitute, G. L. c. 272, § 7, as well as for trafficking of persons for sexual servitude, G. L. c. 265, § 50 (a).

The defendants next contend that G. L. c. 265, § 50 (a), is unconstitutionally overbroad on its face because it significantly infringes on the right to freedom of association as guaranteed by the First Amendment. In their view, because

§ 50 (a) lacks the element of force or coercion, it renders unlawful virtually any interaction between family members, friends, or organizations and a known prostitute.[11]  We disagree.

"A clear and precise enactment may . . . be 'overbroad' if in its reach it prohibits constitutionally protected conduct." Planned Parenthood League of Mass., Inc. v. Operation Rescue, 406 Mass. 701, 715 (1990), quoting Grayned, 408 U.S. at 114. See Commonwealth v. Casey, 42 Mass. App. Ct. 512, 516 (1997). Freedom of association encompasses "[a] right 'to enter into and maintain certain intimate human relationships,' and a right 'to associate for the purpose of engaging in those activities protected by the First Amendment -- speech, assembly, petition for the redress of grievances, and the exercise of religion.'" Concord Rod & Gun Club, Inc. v. Massachusetts Comm'n Against Discrimination, 402 Mass. 716, 721 (1988), quoting Roberts v. United States Jaycees, 468 U.S. 609, 617-618 (1984).  See Disler, 451 Mass. at 230.  "[W]here conduct and not merely speech is involved . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."  Broadrick v. Oklahoma, 413

---

[11] By way of example, the defendants suggest that a mother who feeds, shelters, or transports her daughter, a known adult prostitute, will run afoul of G. L. c. 265, § 50 (a). Similarly, they continue, a homeless shelter could be deemed to be harboring known prostitutes, thereby engaging in sex trafficking.

U.S. 601, 615 (1973). See Mendoza v. Licensing Bd. of Fall River, 444 Mass. 188, 200 (2005). Given that facial challenges to the constitutionality of a law greatly increase the number of persons who have standing to bring a claim, the Supreme Court has cautioned that the overbreadth doctrine is to be employed "sparingly and only as a last resort." Broadrick, supra at 613. See Commonwealth v. Provost, 418 Mass. 416, 422-423 (1994); Commonwealth v. Abramms, 66 Mass. App. Ct. 576, 580 (2006).

General Laws c. 265, § 50 (a), does not prohibit all interactions or associations between a prostitute and family members, friends, or social service organizations. Rather, it forbids such individuals or entities from knowingly undertaking specified activities that will enable or cause another person to engage in commercial sexual activity. Conduct of this nature is afforded no constitutional protection. See generally Arcara v. Cloud Books & News Store, Inc., 478 U.S. 697, 698-699, 705, 707 (1986) (prostitution and lewdness on premises of "adult" bookstore not protected under First Amendment); Commonwealth v. Walter, 388 Mass. 460, 464 (1983) (constitutional right to privacy not extended to one engaged in prostitution); State v. Theriault, 157 N.H. 215, 219 (2008), quoting Webb v. State, 575 N.E.2d 1066, 1070 (Ind. Ct. App. 1991) ("Certainly prostitution is not a constitutionally protected activity"). Accordingly, the defendants' claims that the statute is overbroad must fail.

Finally, the defendants contend that the phrase "commercial sexual activity" as used in G. L. c. 265, § 50 (a), and as defined by G. L. c. 265, § 49, and by the judge in her jury instructions, is overbroad.  In their view, this phrase can encompass many noncriminal sexually oriented activities where money exchanges hands, including "telephone sex" services, nude dancing, online "chat" session, and adult pay-per-view television shows.  That being the case, the defendants continue, the overly broad definition of "commercial sexual activity" should render G. L. c. 265, § 50 (a), unconstitutional.  We disagree.

General Laws c. 265, § 49, defines "[c]ommercial sexual activity" as "any sexual act on account of which anything of value is given, promised to or received by any person."[12]  The

---

[12] This definition is nearly identical to the definition of "commercial sex act" used in the analogous Federal sex trafficking statute.  See 18 U.S.C. § 1591(e)(3) ("The term 'commercial sex act' means any sex act, on account of which anything of value is given to or received by any person").  See note 8, supra.  The defendants have not cited, and we have not found, any case in which a court has concluded that the Federal sex trafficking statute is unconstitutionally overbroad.  The defendants' reliance on Backpage.com, LLC v. Cooper, 939 F. Supp. 2d 805, 832 (M.D. Tenn. 2013), is unpersuasive.  In that case, the United States District Court for the Middle District of Tennessee considered whether to enjoin a State statute that criminalized the sale of certain sexually oriented advertisements.  See id. at 813.  In granting the injunction, the court concluded, among other things, that the definition of "commercial sex act" was likely overbroad because it would include substantial activity unrelated to sex trafficking and

phrase "sexual act" is not further defined in the statute. Under well-established principles of statutory construction, "a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated."  Commonwealth v. Figueroa, 464 Mass. 365, 368 (2013), quoting Harvard Crimson, Inc. v. President & Fellows of Harvard College, 445 Mass. 745, 749 (2006).  The purpose and intent of the Legislature in enacting G. L. c. 265, § 50 (a), was to prohibit the trafficking of persons for sexual servitude, not to prohibit all range of sexually oriented activities and expressions.  Mindful of this distinction, we construe the term "commercial sexual activity" as referring to any sexual act for value that involves physical contact.  See G. L. c. 265, § 49. See also Suliveres v. Commonwealth, 449 Mass. 112, 118 (2007) ("sex act" includes sexual intercourse); Commonwealth v. Walter, 388 Mass. 460, 463-464 (1983) ("sexual activity" encompasses coitus, oral-genital contact, and digital manipulation of another person's genitals for fee).  See generally United States

---

would chill the free speech rights of publishers.  See id. at 832.  Such concerns are not at issue here.

v. Taylor, 640 F.3d 255, 258 (7th Cir. 2011) ("sexual act" involves physical contact). This interpretation is consistent with the plain language of G. L. c. 265, § 50 (a), gives force to the Legislature's intent to protect victims of sex trafficking, and avoids any potential constitutional problems. As so construed, we believe the statute "avoids any overbreadth problems, and 'whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied.'" Provost, 418 Mass. at 423, quoting Broadrick, 413 U.S. at 615-616. See Disler, 451 Mass. at 229.

3. Substantive admission of grand jury testimony. We begin with some pertinent background. At trial, S.E. testified that, prior to meeting the defendants, she made the acquaintance of a man named Ray and his cousin, Ethel Watler.[13] On the day they met, S.E. accompanied Ray to his apartment, where they "hung out." Later in the evening, S.E. and Watler went to another man's house where each woman had sex with the man for money. When the women returned to Ray's apartment, Watler and Ray took the money that S.E. had earned, allowing her to keep only twenty dollars for medication. The next morning, S.E. went

_____

[13] S.E. referred to Ethel Watler by her nickname, "Ellie."

to a methadone clinic, she did not return to Ray's apartment, and she never saw Watler and Ray again.

Watler testified at trial pursuant to a grant of immunity. See G. L. c. 233, § 20E. She described her work as a dancer and an escort. Watler said that she met Tyshaun probably one month after her encounter with S.E., and stated that she would see Tyshaun two or three times a week. She acknowledged that they had engaged in a sexual relationship. Watler testified about the evening she had spent in the company of S.E., and she said that she had told Tyshaun about that evening and had shown him photographs of S.E. When the prosecutor asked Watler whether Tyshaun had taken photographs of Watler to be posted on Backpage.com, Watler stated that she did not remember because she had been doing drugs at the time. Watler responded in a similar fashion when the prosecutor asked her about any conversations she may have had with Tyshaun regarding S.E. and the other women.

The prosecutor attempted, unsuccessfully, to refresh Watler's recollection by having her read to herself portions of her grand jury testimony. Consequently, the prosecutor asked the judge to allow the Commonwealth to use Watler's grand jury testimony substantively. The judge instructed the prosecutor to lay more of a foundation regarding Watler's inability to remember facts to which she had testified before the grand jury,

namely the defendants' activities and admissions.  After Watler continued to profess her inability to remember such facts, the prosecutor again asked for the admission of Watler's grand jury testimony.  The judge allowed portions of such testimony to be admitted substantively over the defendants' objections after finding that Watler was feigning a lack of memory, and that her grand jury testimony did not appear to have been coerced.[14]  As to the latter finding, the judge stated that Watler frequently volunteered additional information in response to the questions she was asked.  The judge also pointed out that because Watler was present in court, defense counsel would have the opportunity to cross-examine her.

The prosecutor proceeded to question Watler, who then read portions of her grand jury testimony in evidence.[15]  Watler stated that Tyshaun told her that S.E. "was making money," and that he and Sidney had engaged in a "threesome" with S.E. at the

---

[14] The judge required the prosecutor to designate specifically the portions of Watler's grand jury testimony that the Commonwealth sought to have admitted in evidence.  The prosecutor did so at the bench, in the presence of defense counsel, while the jury was in recess.

[15] Watler's grand jury testimony was introduced as follows: The prosecutor asked Watler a question, she awaited a response, and, based on the nature of the response, she directed Watler's attention to specific pages and lines of the transcript of her grand jury testimony.  The prosecutor then read the question from the transcript, and she had Watler read her answer to that question.

house on Dudley Street.  Watler identified the Eustis Street apartment as a place where Tyshaun told her he had rented rooms, and where he said Watler could bring "customers."  Watler testified that Tyshaun had taken photographs of her in the bathroom of the Dudley Street apartment, and that he had paid for her online advertisements with a credit card.  Watler further testified that Tyshaun had told her that "he had two white girls [who] had left him" and that he wished he had S.E. because "she made a lot of money."  On cross-examination, Watler stated that prior to giving her grand jury testimony, she had asked to consult with an attorney but was told by someone in the district attorney's office that she did not need an attorney because she "wasn't in any trouble."  She agreed with defense counsel that her grand jury testimony was what she thought the Commonwealth wanted to hear because "they had a whole bunch of stuff on [her]."  Watler testified that S.E. had been a prostitute before the two women had met, and that S.E. wanted to make money in exchange for sex and had been "a willing participant."  She also testified that her conversations about S.E. had been with Tyshaun, not Sidney.

On appeal, the defendants contend that the substantive admission of Watler's grand jury testimony was improper.  They argue that they could not cross-examine Watler effectively at trial because of her lack of memory, and the evidence failed to

support the judge's finding that Watler was feigning memory loss. The defendants further assert that Watler's grand jury testimony was not free from coercion. They point out that she was aware of potential criminal charges against her if she did not cooperate with the Commonwealth, and was not granted immunity until she testified at trial. Finally, the defendants argue that the substantive admission of Watler's grand jury testimony was gravely prejudicial, as evidenced by the jury's request for a transcript of this testimony during their deliberations.[16] We are not persuaded by the defendants' arguments and conclude that the judge did not err.

Generally speaking, Massachusetts has adhered to the traditional rule that prior inconsistent statements of a witness may be introduced at trial only for the purpose of impeachment. See Commonwealth v. Bookman, 386 Mass. 657, 665 (1982). See also Mass. G. Evid. § 801(d)(1)(A) (2015). However, in Commonwealth v. Daye, 393 Mass. 55, 71-75 (1984), as modified by Commonwealth v. Cong Duc Le, 444 Mass. 431, 432 n.3 (2005), this court deviated from the traditional rule, holding that prior inconsistent statements by a witness before a grand jury can be admitted as substantive evidence if certain conditions are met. See Commonwealth v. Stewart, 454 Mass. 527, 533 (2009); Mass.

---

[16] The jury's request was denied by the judge.

G. Evid., supra. First, there has to be an opportunity for effective cross-examination of the witness at trial. See Daye, supra at 73. "When the witness at trial has no recollection of the events to which the statement relates, this requirement of an opportunity for meaningful cross-examination is not met." Id. Second, the statement has to be "that of the witness, rather than the interrogator." Id. at 74. That is to say, it must be clear that "the statement was not coerced and was more than a mere confirmation or denial of an allegation by the interrogator." Id. at 75. In addition, "apart from these requirements for admissibility of the prior grand jury testimony as substantive evidence, when that testimony concerns an essential element of the crime, the Commonwealth must offer at least some corroborative evidence if there is to be sufficient evidence to warrant a conviction." Commonwealth v. Clements, 436 Mass. 190, 192-193 (2002). See Daye, supra at 74-75. This corroboration requirement concerns the sufficiency of the evidence, not its admissibility. See Clements, supra.

In Commonwealth v. Sineiro, 432 Mass. 735, 745 & n.12 (2000), we extended the holding of Daye to include grand jury testimony of a witness who a trial judge determines is "falsifying a lack of memory." See Commonwealth v. Maldonado, 466 Mass. 742, 755-756, cert. denied, 134 S. Ct. 2312 (2014). "As one commentator has aptly stated: '[T]he tendency of

unwilling or untruthful witnesses to seek refuge in a claim of forgetfulness is well recognized.  Hence the judge may be warranted in concluding under the circumstances the claimed lack of memory of the event is untrue and in effect an implied denial of the prior statement, thus qualifying it as inconsistent.'" Sineiro, supra at 742, quoting 2 McCormick, Evidence § 251, at 117 (5th ed. 1999).  "Before a witness's grand jury testimony may be admitted under the Daye-Sineiro rule, the judge must make a preliminary finding that the witness's claimed lack of memory has been fabricated.  If that finding is made and is supported by the evidence, it is conclusive." Commonwealth v. Evans, 439 Mass. 184, 190, cert. denied, 540 U.S. 923 (2003).  See Sineiro, supra at 742-743 & n.6.  Once the judge makes a finding of feigned memory, the witness's prior grand jury testimony may be admitted in evidence for substantive consideration provided that the testimony was not coerced and the witness is present at trial for cross-examination.  See id. at 745 & n.12.

Here, the judge acted well within her discretion in finding that Watler was feigning memory loss with respect to the defendants' activities and admissions concerning S.E.  The judge was able to observe Watler's demeanor on the witness stand and to assess her ability to remember many of her interactions and conversations with Tyshaun, but not those that had a bearing on the specific facts of this case.  As the judge properly found,

Watler was available for cross-examination at trial, and defense counsel took advantage of that opportunity by eliciting testimony that provided context to Watler's grand jury testimony and enabled the jury to evaluate its accuracy. We discern no error in the judge's determination that Watler's testimony before the grand jury was not coerced. Moreover, defense counsel raised and explored the possibility of coercion during cross-examination. The judge properly allowed the substantive admission of limited portions of Watler's grand jury testimony.

4. Cross-examination regarding pending criminal charges. The defendants contend that the judge violated their right to confrontation by hindering cross-examination of C.C. regarding criminal charges pending against her. They assert that because a defendant is entitled to reasonable cross-examination of a prosecution witness for the purpose of showing bias, the judge abused her discretion by precluding defense counsel from impeaching C.C. with evidence that she had been charged with several drug-related offenses. In the defendants' view, where C.C. testified that she had been told that the district attorney was not interested in prosecuting her, the defendants should have been allowed to explore the possibility that she might have been biased in favor of the Commonwealth. Alternatively, the defendants argue that their trial counsel rendered ineffective assistance by failing to seek the introduction of the pending

charges against C.C., which could have demonstrated her bias and negated her credibility.

Following an incident that occurred approximately three months after C.C. testified before the grand jury in the present case, C.C. was charged in the Taunton Division of the District Court Department with possession of a Class A controlled substance, operating a motor vehicle while under the influence of drugs, and being present where heroin was kept. The Commonwealth filed a motion in limine to preclude any reference to these charges at trial. After a hearing, the motion was allowed. At trial, before the commencement of empanelment, counsel for Tyshaun informed the judge that he did not intend to introduce any evidence of such charges, stating, "I don't really see how a pending charge is going to come in." Similarly, although not entirely clear from the trial transcript, it appears that counsel for Sidney did not object to the exclusion of testimony concerning the pending criminal charges against C.C. To the extent that he did argue for the admissibility of such evidence, the basis for his argument was that evidence of C.C.'s drug use was relevant to her ability to remember what had happened to her, which pertained to her credibility. Neither defense attorney mentioned the issue of bias. In response to a question from the judge, the prosecutor represented that the

Commonwealth had not made or offered any promises, rewards, or inducements relating to the pending criminal charges.

As a general matter, "[a]rrest or indictment alone is insufficient for general impeachment purposes." Commonwealth v. Haywood, 377 Mass. 755, 759 (1979). See G. L. c. 233, § 21. See also Commonwealth v. Bregoli, 431 Mass. 265, 275 (2000) (witness cannot be impeached by use of specific act of misconduct not resulting in conviction). However, "it is well established that a criminal defendant is 'entitled, as of right, to reasonable cross-examination of a witness for the purpose of showing bias, particularly where that witness may have a motivation to seek favor with the government.'" Haywood, supra at 760, quoting Commonwealth v. Dougan, 377 Mass. 303, 310 (1979). See Commonwealth v. Henson, 394 Mass. 584, 586-587 (1985). "A defendant has the right to bring to the jury's attention any 'circumstance which may materially affect' the testimony of an adverse witness which might lead the jury to find that the witness is under an 'influence to prevaricate.'" Haywood, supra, quoting Commonwealth v. Marcellino, 271 Mass. 325, 327 (1930). It follows that a defendant may question a witness about pending criminal charges in order to show that the witness has a motive to cooperate with the Commonwealth. See Commonwealth v. Meas, 467 Mass. 434, 449-450, cert. denied, 135 S. Ct. 150 (2014), quoting Commonwealth v. Carmona, 428 Mass.

268, 270 (1998). See also Henson, supra. However, we have recognized that evidence of an adverse witness's prior arrest is not admissible "in all circumstances." Haywood, supra at 761. See Commonwealth v. Santos, 376 Mass. 920, 924-926 (1978); Commonwealth v. Allen, 29 Mass. App. Ct. 373, 378 (1990). See also Dougan, supra (judge has broad discretion in circumscribing proper scope of cross-examination). "[A] defendant is required to furnish some persuasive explanation why the arrest might indicate bias or a motive to lie." Allen, supra. See Commonwealth v. Two Juveniles, 397 Mass. 261, 267 (1986). The explanation is necessary in order for the judge to "make an appraisal of the materiality of the testimony sought in light of [the defendant's] right 'to show specific bias or motive to prevaricate on the part of the government witness.'" Haywood, supra, quoting Santos, supra at 924. See Allen, supra.

In this case, defense counsel made no mention to the trial judge of wanting to use the pending criminal charges against C.C. to show that, in their view, she was biased in favor of the Commonwealth. There also was no evidence to suggest that after C.C. was charged with the three drug-related offenses, she changed her version of the events that had transpired with the defendants. We conclude that the judge did not abuse her discretion in precluding any reference to these charges at trial. In addition, contrary to the defendants' assertions,

there was no ineffective assistance of counsel.  During cross-examination of C.C., although counsel for Tyshaun did not raise the three drug-related offenses pending against her, he did pursue a line of inquiry about whether the Commonwealth had agreed not to prosecute C.C. for any crimes that she may have committed while she was with the defendants in exchange for her cooperation and testimony against them.  C.C. acknowledged that she had not been prosecuted for any such crimes, and that someone from the district attorney's office had told her that the Commonwealth had no interest in prosecuting her.  This line of questioning served to alert the jury to the issue of possible bias, and the jury could consider the matter during their deliberations.

5.  <u>Cross-examination regarding history of prostitution</u>. The defendants contend that the judge also violated their right to confrontation by hindering cross-examination of C.C. regarding her history of prostitution.[17]  In their view, the judge erroneously relied on the rape shield statute, G. L. c. 233, § 21B, to prevent such a line of inquiry.  The defendants argue that they were not attempting to elicit evidence of C.C.'s promiscuity as part of a general credibility

_____

[17] As best we can discern from the record, Tyshaun never sought to admit evidence of C.C.'s purported history of prostitution.  The matter was only raised by Sidney, who seemed to indicate to the judge that it was relevant to show that C.C. was willing to have sex in exchange for drugs.

attack.  Rather, the defendants continue, they sought to show the jury that, contrary to the Commonwealth's assertion that they forced C.C. into prostitution, C.C. was a willing participant who had a history of engaging in such activities. We conclude that the judge did not err in excluding evidence of C.C.'s purported history of prostitution.

A trial judge has broad discretion to determine the proper scope of cross-examination.  See Commonwealth v. Mountry, 463 Mass. 80, 86 (2012); Commonwealth v. Johnson, 431 Mass. 535, 538 (2000).  "If a defendant believes that the judge improperly restrained his cross-examination of a witness, the defendant must demonstrate that the judge abused [her] discretion and that he was prejudiced by such restraint."  Commonwealth v. Sealy, 467 Mass. 617, 624 (2014), quoting Commonwealth v. Barnes, 399 Mass. 385, 393 (1987).

General Laws c. 233, § 21B, provides, in relevant part, that "[e]vidence of the reputation of a victim's sexual conduct shall not be admissible in an investigation or proceeding before a grand jury or a court of the commonwealth for a violation of [G. L. c. 265, § 50]."  The primary purpose of the rape shield statute is "to prevent a general credibility attack of a victim with evidence of his or her promiscuity."  Mountry, 463 Mass. at 86.  Among the reasons for barring the admission of such evidence is that it has little probative value on the issue of

consent because the "victim's consent to intercourse with one man does not imply her consent in the case of another." Commonwealth v. Harris, 443 Mass. 714, 722-773 (2005), quoting Commonwealth v. McKay, 363 Mass. 220, 227 (1973).

Irrespective of how the defendants have couched their arguments, they seem to be asserting that because C.C. purportedly engaged in prostitution in the past, she effectively consented to the defendants' malfeasance, and the jury should have had the opportunity to consider this evidence. We disagree. As the judge properly determined, the introduction of evidence pertaining to C.C.'s past sexual conduct with others was plainly barred by G. L. c. 233, § 21B. Moreover, as we have discussed, coercion is not an element of the crime of sex trafficking. See G. L. c. 265, § 50 (a). That being the case, it was irrelevant whether C.C. was a willing participant in the defendants' activities. The exclusion of evidence pertaining to C.C.'s alleged history of prostitution had no bearing on whether the defendants violated G. L. c. 265, § 50 (a), and such exclusion did not prejudice the defendants' cases.

6. Illegal sentences. Tyshaun contends that his sentences for two counts of deriving support from the earnings of a prostitute were illegal. He points out that although the applicable statute, G. L. c. 272, § 7, mandates a minimum sentence of two years and a maximum sentence of five years, he

was sentenced to the State prison for a term of from five years to five years and one day. Therefore, he continues, the judge exceeded the maximum sentence allowed under G. L. c. 272, § 7. We agree.[18]

"An illegal sentence is one that is not permitted by law for the offense committed." Commonwealth v. McGuinness, 421 Mass. 472, 475 (1995). See Commonwealth v. Layne, 21 Mass. App. Ct. 17, 19 (1985) ("An 'illegal sentence' is one that is in excess of the punishment prescribed by the relevant statutory provision or in some way contrary to the applicable statute"). General Laws c. 272, § 7, provides, in relevant part:

> "Whoever, knowing a person to be a prostitute, shall live or derive support or maintenance, in whole or in part, from the earnings or proceeds of his prostitution . . . shall be punished by imprisonment in the state prison for a period of five years and by a fine of [$5,000].

> "The sentence of imprisonment imposed under this section shall not be reduced to less than two years, nor suspended, nor shall any person convicted under this section be eligible for probation, parole, or furlough or receive any deduction from his sentence for good conduct or otherwise until he shall have served two years of such sentence."

---

[18] An entry in the Superior Court's docket for Tyshaun's case indicates that he filed a pro se motion to revise and revoke, and that it was denied by the trial judge. This motion was neither included in the record appendix in this appeal nor mentioned by Tyshaun in his brief. In any event, an appeal may properly challenge an illegal or unconstitutional sentence. See Commonwealth v. Molino, 411 Mass. 149, 155 (1991); Commonwealth v. Sanchez, 405 Mass. 369, 379 n.7 (1989).

We have construed this statute as imposing a maximum term of five years and a minimum term of two years.  See Commonwealth v. Lightfoot, 391 Mass. 718, 721 (1984).  The punishment imposed on Tyshaun was in excess of the statute given that G. L. c. 272, § 7, does not permit a maximum sentence of five years and one day.  Accordingly, Tyshaun's sentences for his convictions of deriving support from the earnings of a prostitute must be revised to reflect maximum sentences of five years.

7.  Conclusion.  For the foregoing reasons, the judgments of conviction on the indictments charging Tyshaun with trafficking persons for sexual servitude and deriving support from the earnings of a prostitute are affirmed.  His sentences following the judgments of conviction on the indictments charging him with deriving support from the earnings of a prostitute are vacated, and those cases are remanded to the Superior Court for resentencing consistent with this opinion. The judgments of conviction on the indictments charging Sidney with trafficking persons for sexual servitude are affirmed.

So ordered.