## Commonwealth vs. Raheem B. Garrett.

Berkshire. September 8, 2015. - November 25, 2015.

Present: Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, & Hines, JJ.

*Robbery. Firearms. Evidence*, Firearm, Exculpatory. *Practice, Criminal*, Indictment, Instructions to jury, Assistance of counsel, Lesser included offense.

This court concluded that a BB gun is not a firearm for purposes of the armed robbery statute, G. L. c. 265, § 17. [259-264]

Language in indictments charging the defendant with armed robbery while masked, in violation of G. L. c. 265, § 17, that stated that the defendant was armed "with a handgun" did not render the indictments legally insufficient, where, in ordinary usage, a handgun is understood to be a firearm. [264-265]

At the trial of indictments charging the defendant with armed robbery while masked, in violation of G. L. c. 265, § 17, the judge's instruction to the jury was erroneous insofar as it permitted the jury to find that a BB gun met the statutory requirement of being armed with a firearm; however, where this court vacated the defendant's convictions of armed robbery, no substantial risk of a miscarriage of justice arose. [265-266]

At a criminal trial, defense counsel was not ineffective in failing to argue that deoxyribonucleic acid (DNA) evidence was exculpatory, where, given that the defendant's DNA was not excluded as a match for the DNA evidence found, there was no reasonable probability that, had the argument been made, it might have resulted in a different outcome. [266]

This court, having vacated the defendant's convictions of armed robbery, which improperly relied on evidence that the defendant used a BB gun to perpetrate each of the offenses, remanded the matter for entry of judgments of conviction of the lesser included offense of unarmed robbery. [266-267] Gants, C.J., concurring, with whom Spina and Cordy, JJ., joined.

Indictments found and returned in the Superior Court Department on December 16, 2011.

The cases were tried before *John A. Agostini*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Michael J. Hickson* for the defendant.

*John P. Bossé*, Special Assistant District Attorney, for the Commonwealth.

Duffly, J. The defendant was convicted by a Superior Court jury on three indictments charging armed robbery with a firearm while masked, in violation of G. L. c. 265, § 17, the armed rob-

bery statute.[1] To prove that the defendant was armed with a "firearm," the Commonwealth relied on evidence that the defendant used a BB gun to perpetrate each of the robberies. The defendant appealed from his convictions, and we allowed the Commonwealth's petition for direct appellate review. The defendant contends that the evidence was insufficient to support his convictions because a BB gun is not a "firearm" within the meaning of the armed robbery statute. The defendant maintains also that the indictments were facially invalid, certain errors in the jury instructions require reversal, and his trial counsel provided constitutionally ineffective assistance in several respects.

Because we conclude that a BB gun does not satisfy the statutory requirement of a "firearm" within the meaning of G. L. c. 265, § 17, the defendant's convictions of armed robbery by means of a firearm cannot stand. Accordingly, those convictions must be vacated and the matter remanded to the Superior Court for entry of judgments of guilt on the lesser included offense of unarmed robbery.

*Background.* We recite the facts the jury could have found, reserving certain facts for later discussion of individual issues. In 2011, the defendant was experiencing financial difficulties after he and his then live-in girl friend, Laura Methe, lost their jobs and were unable to find new employment. In an effort to improve their financial circumstances, the defendant and Methe robbed stores in the city of Pittsfield. To commit the robberies, the defendant used a BB gun that he and Methe had purchased for that purpose at a sporting goods store.[2]

The first robbery was of a pizza shop. The defendant entered the store wearing a homemade black mask, pointed at the assistant store manager what appeared to him to be a gun, and demanded the money from the cash register. Methe, acting as the getaway driver, waited in her white GMC sport utility vehicle (SUV). The two later split the cash. The second robbery was of

---

[1]The defendant was indicted on seven counts of armed robbery with a firearm while masked; two counts of armed assault with intent to rob; two counts of armed assault by means of a dangerous weapon; and one count of attempt to commit armed robbery with a firearm while masked. The Commonwealth entered nolle prosequi on two of the indictments charging armed robbery with a firearm while masked. The defendant was acquitted on seven of the indictments.

[2]The sporting goods store offered several types of BB guns. No evidence was introduced as to which type was purchased, or how the several available types were distinguishable.

a convenience store. Again, the defendant wore a black mask and pointed the BB gun at two clerks, one of whom the defendant ordered to open the safe and hand him the money. Approximately two months later, the defendant and Methe returned to the pizza shop. The same assistant store manager, who was in the store along with another employee, recognized the mask and clothing worn by the robber as those worn during the previous robbery, and the weapon as the same one the prior robber had brandished. The robber demanded that the manager open the cash register and give him the money; the manager recognized the robber's voice as identical to that of the first robber. The manager handed over the money.

After the robber left the store, the manager ran outside and saw a white SUV, either a GMC Jimmy or a Chevrolet Blazer, leaving the parking lot quickly and driving north without any headlights. He telephoned 911 and reported the location of the SUV. A Pittsfield police department sergeant responded to the radio dispatch. With the aid of another officer, he ultimately located and apprehended the defendant and Methe, who was driving, in her SUV.

*Discussion.* 1. *Whether a BB gun is a firearm within the meaning of the armed robbery statute.* For the first time on appeal, the defendant claims that a BB gun does not meet the statutory definition of a "firearm," and therefore that the evidence was insufficient to support his conviction. Although the defendant's sufficiency of the evidence claim was not preserved, we nonetheless consider it because "findings based on legally insufficient evidence are inherently serious enough to create a substantial risk of a miscarriage of justice." *Commonwealth* v. *McGovern*, 397 Mass. 863, 867-868 (1986). See *Commonwealth* v. *Hinds*, 437 Mass. 54, 63 (2002), cert. denied, 537 U.S. 1205 (2003). Whether, as a matter of statutory interpretation, a BB gun is a "firearm" is a question of law. See, e.g., *Commonwealth* v. *Fenton*, 395 Mass. 92, 94-95 (1985), quoting *Commonwealth* v. *Sampson*, 383 Mass. 750, 761 (1981).

To determine whether a BB gun is a firearm for the purposes of the armed robbery statute, we analyze the statutory language under the familiar principle of statutory construction that a statute is to be interpreted "according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be

remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Commonwealth* v. *Galvin*, 388 Mass. 326, 328 (1983), quoting *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513 (1975). Although we begin with the plain language of the statute, *Commonwealth* v. *Cory*, 454 Mass. 559, 563 (2009), where the language is not conclusive as to the Legislature's intent, we may seek guidance from the legislative history and the language of related statutes. See *Commonwealth* v. *Wynton W.*, 459 Mass. 745, 747 (2011); *Commonwealth* v. *McLeod*, 437 Mass. 286, 290 (2002).

The armed robbery statute, G. L. c. 265, § 17, contains no explicit definition of the term "firearm." Nor does the statute incorporate explicitly any definition from another statute. The term "firearm," however, is defined in G. L. c. 140, § 121, a part of the statute that governs licensing and regulation of firearms. See G. L. c. 140, §§ 121-131Q. Under this provision, a "firearm" is, with certain exclusions for weapons that resemble other objects, defined as a "pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than [sixteen] inches or [eighteen] inches in the case of a shotgun as originally manufactured." See G. L. c. 140, § 121 (gun control act). This definition, which has not been altered significantly since 1934, is the foundation for the Legislature's gun control framework; indeed, the definition was incorporated virtually unchanged from the 1934 version of the statute when the Legislature rewrote the gun control act in 1998. See St. 1934, c. 359, § 1; St. 1998, c. 180 § 8 ("An act relative to gun control in the Commonwealth").[3]

The Commonwealth argues that the definition of "firearm" in the gun control act may be viewed as the source of the definition of a "firearm" in the armed robbery statute and that the BB gun at issue here falls within that definition. We do not agree. Nothing within the framework of the gun control act supports an interpretation that the Legislature intended to regulate BB guns in the same manner as it regulates firearms.[4] To the contrary, such an interpretation is inconsistent with the gun control act, which does

---

[3]In 1934, the Legislature amended the definition to substitute "is less than eighteen" inches for "does not exceed twelve" inches. St. 1934, c. 359, § 1.

[4]General Laws c. 140, §§ 121-131Q, which expressly incorporate the definition of a firearm in G. L. c. 140, § 121, are all provisions that relate to the regulation, sale, transfer, and licensing of guns and firearms. See, e.g., G. L. c. 140, § 122 (fees and procedures for issuance of licenses, procedure on refusal

not mention BB guns, and with the Legislature's long-standing separate regulation of BB guns.

The statutory regulation of "air rifle[s] or so-called BB gun[s]" reflects that the Legislature was responding primarily to the risk of misuse of BB guns in the hands of minors.[5] See G. L. c. 269, § 12A ("Air rifles; sale to minors"); G. L. c. 269, § 12B ("Air rifles; possession by minors; shooting"). These provisions were made part of the General Laws in 1951, by an act "regulating the sale and use of air rifles or so-called BB guns." See St. 1951, c. 263.[6] General Laws c. 269, § 12A, regulates the sale of air guns or BB guns to minors.[7] General Laws c. 269, § 12B, is concerned primarily with the actions of minors in possession of BB guns. It provides:

> "No minor under the age of eighteen shall have an air rifle or so-called BB gun in his possession while in any place to which the public has a right of access unless he is accompanied by an adult or unless he is the holder of a sporting or hunting license and has on his person a permit . . . granting him the right of such possession. No person shall discharge a BB shot, pellet or other object from an air rifle or so-called BB gun into, from or across any street, alley, public way or

of license, and punishment for improper issuance); G. L. c. 140, § 125 (forfeiture or suspension of license if license holder convicted of felony); G. L. c. 140, § 128B (unauthorized sale of firearms).

[5]We have said that, absent indication of contrary legislative intent, a BB gun is akin to an "air rifle," and we have considered definitions of BB guns, air rifles, and air guns as interchangeable. See *Commonwealth* v. *Fenton*, 395 Mass. 92, 95 (1985) (declining to create legal distinction between air gun, air rifle, and BB gun); *Commonwealth* v. *Rhodes*, 389 Mass. 641, 643 (1983) (treating air gun and BB gun as interchangeable for legal analysis).

[6]As originally enacted, G. L. c. 269, § 12B, applied to minors under the age of sixteen. See St. 1951, c. 263. In 1957, the Legislature amended it, raising the oldest regulated age from under sixteen to under eighteen years old. See St. 1957, c. 688, § 31. The remaining provisions did not substantively change the nature of the statutory offenses. In 1968, the Legislature rewrote the penultimate sentence of that section, increasing the maximum amount of the fine that could be imposed to one hundred dollars. See St. 1968, c. 737, § 16. The 1996 amendment included a single change, to replace "commissioner of public safety" with "colonel of the state police." See St. 1996, c. 151, § 493.

[7]"Whoever sells to a minor under the age of eighteen or whoever, not being the parent, guardian or adult teacher or instructor, furnishes to a minor under the age of eighteen an air rifle or so-called BB gun, shall be punished by a fine of not less than fifty nor more than two hundred dollars or by imprisonment for not more than six months." G. L. c. 269, § 12A.

railroad or railway right of way, and no minor under the age of eighteen shall discharge a BB shot, pellet or other object from an air rifle or BB gun unless he is accompanied by an adult or is the holder of a sporting or hunting license. Whoever violates this section shall be punished by a fine of not more than one hundred dollars, and the air rifle or BB gun or other weapon shall be confiscated."

G. L. c. 269, § 12B.

Notably, adults who possess BB guns are not subject to the same restrictions as are minors. See *Commonwealth* v. *Fenton*, 395 Mass. 92, 95 (1985); *Commonwealth* v. *Rhodes*, 389 Mass. 641, 645 (1983). For persons other than minors, the Legislature prohibits the discharge of BB guns "into, from or across any street, alley, public way or railroad or railway right of way," G. L. c. 269, § 12B, and prohibits possession of a loaded BB gun in any place where birds or mammals might be found, with certain exceptions for hunting. See G. L. c. 131, § 66. Since G. L. c. 269, §§ 12A and 12B, were enacted in 1951, the Legislature has not amended the statutory scheme to provide explicitly that BB guns should be treated in the same manner as firearms for purposes of the gun control act.

The Legislature also has not amended the definition of firearm to include air rifles or BB guns since our decision in *Fenton*, *supra* at 94. In that case, we concluded that a defendant who was in possession of a type of revolver that was "within the common lexical definitions of 'air gun' " could not be convicted of unlawfully carrying a firearm under G. L. c. 269, § 10 (*a*).[8] *Fenton*, *supra*. Indeed, in 1998, with the passage of the gun control act, the Legislature continued its disparate treatment of BB guns and firearms. Notwithstanding the act's broad amendment of statutes dealing with firearms and guns, the gun control act did not extend

---

[8] A number of dictionary definitions support this view. See *Commonwealth* v. *Fenton*, *supra* at 94 n.5, and definitions cited. See, e.g., Black's Law Dictionary 751 (10th ed. 2014) (defining "firearm" as "[a] weapon that expels a projectile [such as a bullet or pellets] by the combustion of gunpowder or other explosive . . . . [a]lso termed gun"); The American Heritage Dictionary of the English Language 1804 (4th ed. 2006) (defining air rifle as "[a] low-powered rifle, such as a BB gun, that uses compressed air or gas to fire pellets"); Webster's New Universal Unabridged Dictionary 44 (2003) (defining air gun as "a gun operated by compressed air"); Webster's Third New Int'l Dictionary 47 (1993) (defining air rifle as "a rifle from which a projectile is propelled by air or carbon dioxide compressed usu[ally] by a lever and pump system").

the provisions concerning BB gun licensing beyond those requiring licensing for minors. Moreover, at the same time that the Legislature revised the entire firearms licensing scheme, it also added provisions for mandatory criminal sentences whenever a firearm was used in the commission of certain crimes, including armed robbery. See St. 1998, c. 180, §§ 50-67. The term "BB gun" appears nowhere in the gun control act. The term "air rifle" appears only once in the eighty sections of St. 1998, c. 180, and then only in the context of a requirement that reports of injury be made to the commissioner of public health. See St. 1998, c. 180, § 5. The Legislature's enactment of the gun control act in 1998, which does not amend the definition of firearm, reflects the legislative intent that BB guns remain subject to their well-established, separate regulation, rather than becoming subject to general gun control act provisions. See *Sheehan* v. *Weaver*, 467 Mass. 734, 740-741 (2014) ("the principle that legislative approval can be derived from legislative silence carries its greatest force when the Legislature has reenacted or amended a statute without disturbing the judicial construction placed on it"); *Commonwealth* v. *Rivera*, 445 Mass. 119, 128 (2005), quoting *Nichols* v. *Vaughan*, 217 Mass. 548, 551 (1914).

Additionally, we note that, when the Legislature has expanded the definition of "firearm" to reach BB guns and similar nonconventional guns, it has done so by expressly providing a broad definition of firearm. For instance, G. L. c. 269, § 10 (*j*), which criminalizes the carrying of a firearm near a school, provides that "[f]or the purposes of this paragraph, 'firearm' shall mean any pistol, revolver, rifle or smoothbore arm from which a shot, bullet or pellet can be discharged." We concluded in *Commonwealth* v. *Sayers*, 438 Mass. 238, 240-241 (2002), that in light of the uniquely broad definition in G. L. c. 269, § 10 (*j*), the term "firearm" there includes a BB gun albeit that BB guns are not explicitly named. *Commonwealth* v. *Sayers*, *supra* at 241. That the Legislature did not broaden the definition of firearm to include a BB gun when it added sentencing enhancement for use of a firearm to the armed robbery statute provides a clear indication that the Legislature intended to maintain the distinction between a "firearm" and a BB gun.

Any other construction would produce absurd results. If BB guns were construed as firearms, they would be subject to the entire gun control act. Consequently, they would only be able to be sold by licensed dealers, G. L. c. 140, § 123; background checks

would be mandatory before obtaining a license to possess a BB gun, G. L. c. 140, § 131; and all BB guns would be required to bear serial identification numbers, G. L. c. 269, § 11E. Even more troubling, were we to read the gun control act as applicable to BB guns, all of the criminal statutes regulating the possession and use of firearms would apply to BB guns, and to the minors who are authorized to use BB guns under G. L. c. 269, § 12B. For instance, G. L. c. 140, § 131L (*a*), establishes that it is "unlawful to store or keep any firearm . . . in any place unless such weapon is secured in a locked container or equipped with a tamper-resistant mechanical lock so as to render such weapon inoperable by any person other than the owner or other lawfully authorized user." Bootstrapping BB guns into this requirement would impose a layer of regulation, with criminal penalties for any violation, upon the proper storage of BB guns. This potentially would subject a broad group of minors to severe adult criminal penalties, with the attendant negative consequence of an adult criminal record. The Legislature could not have intended such a result. See *Galenski* v. *Erving*, 471 Mass. 305, 313-314 (2015) (we view statutory scheme as whole to give effect to all of its provisions).

In sum, we conclude that a BB gun is not a firearm for purposes of the armed robbery statute, G. L. c. 265, § 17.[9] The rule of lenity also militates in favor of this outcome. See *Fenton*, *supra* at 95 ("[a] criminal statute must be sufficiently explicit to give clear warning as to proscribed activities"); *Rhodes*, *supra* at 646-647.

2. *Validity of indictments.* The defendant maintains also that the indictments for the armed robbery charges were invalid because they failed to allege a crime. The defendant did not raise this issue before or at trial. Although a challenge to the sufficiency of an indictment ordinarily is deemed waived unless raised by a motion to dismiss prior to trial, whether an indictment fails to allege an offense is a matter of jurisdiction, which may be raised at any time. See *Commonwealth* v. *Senior*, 454 Mass. 12, 14 (2009). The indictments here were captioned "Firearm-armed and masked robbery, C 265 § 17," but the language of the indictment itself stated that the defendant was armed "with a handgun." The defendant contends that the indictments were legally insufficient because they did not explicitly use the word "firearm." The

---

[9]The defendant maintains that his trial counsel provided ineffective assistance by failing to raise the issue of whether a BB gun was a firearm at trial. Because of the result we reach, we do not reach this claim.

"absence of a required element in an indictment does not by itself establish that a crime is not charged, even if acquittal is required if the prosecution were to prove only the allegations in the indictment." *Commonwealth* v. *Canty*, 466 Mass. 535, 548 (2013). Here, the caption properly identified the statutory violation, and the indictment gave "fair notice" to the defendant of the crime for which he was charged; in ordinary usage, a handgun is understood to be a type of firearm. See *Commonwealth* v. *Sperrazza*, 372 Mass. 667, 670 (1977).

3. *Jury instruction.* The defendant maintains that the judge erred by instructing the jury that, to find the defendant guilty of armed robbery,

> "It is sufficient if the Commonwealth proves beyond a reasonable doubt that the defendant was actually armed with a firearm. A person who uses a replica of a firearm, such as a toy gun or other fake firearm, to commit an assault may be convicted of assault if the victim reasonably believed it to be a real weapon capable of inflicting serious injury or death."

The defendant challenges that portion of the instruction that would permit a jury to find that a replica or toy firearm met the statutory requirement of being armed with a firearm, claiming that that portion of the instruction is relevant only to a charge of being armed with a dangerous weapon, and he was not charged with that offense.

Because a BB gun is not a firearm for purposes of the armed robbery statute, the judge's instruction was erroneous insofar as it related to the offense of armed robbery while being armed with a firearm.[10] In some circumstances, it is possible that a fake or replica weapon might qualify as a dangerous weapon. See, e.g., *Commonwealth* v. *Powell*, 433 Mass. 399, 402 (2001). As the defendant was not charged with armed robbery while armed with a dangerous weapon, the instruction was improper. The defendant did not object to the instruction at trial, and the instruction did not

---

[10]The challenged instruction required that, in order to convict the defendant of armed robbery, the jury find that the defendant was armed with a firearm. The instruction appears to have been based on the particular indictments in this case, which charged "firearm-armed & masked robbery . . . while being armed with a handgun." We hasten to add that the instructions would not have been appropriate in other circumstances. The Commonwealth may of course indict a defendant on charges of armed robbery by means of a dangerous weapon other than a firearm. Here, the defendant was not so indicted.

implicate any of the other elements of the offense. Therefore, because of the result we reach on the defendant's convictions of armed robbery, the improper instruction did not result in a substantial risk of a miscarriage of justice.

4. *Failure to argue that admitted evidence was exculpatory.* The defendant maintains that his trial counsel provided ineffective assistance in failing to argue that admitted deoxyribonucleic acid (DNA) evidence was exculpatory. The defendant argues that expert testimony by the Commonwealth's analyst shows that the expert had concluded that it was substantially more likely that a Caucasian individual, rather than an African-American individual, committed the robbery.[11] The evidence, however, does not support that interpretation. The expert testified that the probability of another randomly selected African-American having matching DNA was extremely low (1 in 1.991 million in the African-American population versus 1 in 1.615 million in the Caucasian population), and the defendant's DNA was not excluded as a match. The witnesses to the robberies also testified that the robber was a "black male." Furthermore, the defendant was apprehended by police while fleeing from the scene of one of the robberies. Consequently, it is unlikely that the argument now suggested by the defendant would have been persuasive. Counsel was not ineffective for failing to make an argument that would have had little, if any, chance of success; there was no "reasonable probability" that, had the argument been made, it might have resulted in a different outcome, see *Commonwealth* v. *Mahar*, 442 Mass. 11, 15 (2004), quoting *Strickland* v. *Washington*, 466 U.S. 668, 694 (1984).

5. *Unarmed robbery as lesser included offense.* Because we conclude that a BB gun is not a firearm within the meaning of G. L. c. 265, § 17, the defendant's convictions of armed robbery cannot stand. The jury were not instructed on any lesser included offense. Nevertheless, where, as here, a jury convicts a defendant of a crime despite insufficient evidence of a required element, but "the remaining untainted elements include all the elements of a lesser included offense, we generally correct the error by vacating conviction of the greater crime, and remanding for entry of conviction of the lesser included offense." See *Commonwealth* v. *Labadie*, 467 Mass. 81, 88, cert. denied sub nom. *Carcieri* v. *Massachusetts*, 135 S. Ct. 257 (2014). See also *Commonwealth* v.

---

[11]The defendant is African-American.

*French*, 462 Mass. 41, 48-49 (2012), and cases cited (appellate courts have inherent authority to order entry of guilt of lesser included offense even absent jury instruction).

In these circumstances, the lesser included offense, untainted by the error of finding a BB gun is a firearm, is unarmed robbery.[12] See *Commonwealth* v. *Jackson*, 419 Mass. 716, 725 n.8 (1995); *Commonwealth* v. *Howard*, 386 Mass. 607, 608 n.2 (1982). To prove unarmed robbery, the Commonwealth must prove that a defendant robbed "by force and violence, or by assault and putting in fear." G. L. c. 265, § 19 (*b*). To prove that a robbery was committed "by assault and putting in fear," the Commonwealth must establish actual fear or apprehension on the part of the victim. *Commonwealth* v. *Joyner*, 467 Mass. 176, 187 (2014). Here, the jury could have found that the defendant committed unarmed robbery by assault and putting in fear: the BB gun had been spray-painted to look like a real gun, and the victims of each of the three robberies testified that they felt afraid during the robberies. The jury thus could have found all of the elements of the lesser included offense of unarmed robbery.

6. *Conclusion.* The judgments of conviction of armed robbery are vacated and set aside. The matter is remanded to the Superior Court for entry of judgments of guilt on the lesser included offense of unarmed robbery, and for resentencing.

*So ordered.*

GANTS, C.J. (concurring, with whom Spina and Cordy, JJ., join). I agree with the court's conclusions and reasoning, but write separately to diminish the risk that the peculiar manner in which the Commonwealth chose to draft the armed robbery indictment in this case may invite confusion regarding our holding.

Under G. L. c. 265, § 17, "[w]hoever, being armed with a dangerous weapon, assaults another and robs, steals or takes from his person money or other property which may be the subject of

---

[12]Armed robbery can be committed with a dangerous weapon, or with a firearm; committing the offense with either form of weapon, while masked, results in an enhanced penalty. See G. L. c. 265, § 17. The defendant was not indicted for, and thus cannot be convicted of, armed robbery with a dangerous weapon. See *Commonwealth* v. *Bright*, 463 Mass. 421, 445 (2012) ("no one may be convicted of a crime . . . without first being indicted for that crime by a grand jury" [citation omitted]); *Commonwealth* v. *Smith*, 459 Mass. 538, 543-544 (2011) (indictment for crime required for conviction of that crime).

larceny shall be punished by imprisonment in the state prison for life or for any term of years." Under § 17, where a defendant commits armed robbery "while masked" or "while armed with a firearm," the defendant "shall" be sentenced to no less than five years in prison for a first offense.

Had the Commonwealth drawn its indictment to allege the crime of armed robbery with a dangerous weapon, the defendant would properly have been found guilty of armed robbery because the BB gun in this case was a dangerous weapon, which under our case law includes a weapon that appears to be a firearm, even if not actually a firearm. See *Commonwealth* v. *Powell*, 433 Mass. 399, 400-401, 404 (2001) (affirming conviction for armed robbery with dangerous weapon where defendant used fake shotgun and it was reasonable for victim to believe that weapon was real). If the Commonwealth had sought a mandatory minimum sentence, it could also have alleged two separate sentence enhancements in the indictment, one alleging that the defendant had committed the armed robbery while masked and the other alleging that he was armed with a firearm. Had it done so, the Commonwealth could have obtained the sentence enhancement arising from the commission of the armed robbery while masked. For the reasons given by the court, the Commonwealth was not entitled to the sentence enhancement arising from the commission of the armed robbery with a firearm, because a BB gun is not a firearm.

The evidence in support of the armed robbery indictment in this case is insufficient only because the Commonwealth alleged that the defendant committed the robbery "while being armed with a handgun," rather than while being armed with a dangerous weapon. As a result of this charging decision, the armed robbery indictment may stand only if the defendant was armed with a handgun, which he was not. It is for this reason that we affirm only the conviction of the lesser included offense of unarmed robbery. In short, the Commonwealth in this case unnecessarily chose to make conviction of armed robbery rest on the defendant being armed with a firearm, when it need only have rested on his being armed with a dangerous weapon.