NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-1766                                           Appeals Court

COMMONWEALTH  vs.  DILLON SILVESTER.

No. 14-P-1766.

Bristol.     January 15, 2016. - May 2, 2016.

Present:  Kafker, C.J., Cohen, Green, Wolohojian, & Henry, JJ.

Evidence, Testimony before grand jury, Cross-examination,
     Videotape, Identification, Constructive possession,
     Opinion, Hearsay.  Practice, Criminal, Transcript of
     testimony before grand jury, Cross-examination by
     prosecutor, Voir dire, Mistrial, Identification of
     defendant in courtroom, Hearsay.  Witness, Cross-
     examination.  Identification.  Firearms.

Indictments found and returned in the Superior Court
Department on June 7, 2012, and November 1, 2012.

The cases were tried before Thomas F. McGuire, Jr., J.

Jennifer Appleyard for the defendant.
David A. Wittenberg, Assistant District Attorney, for the
Commonwealth.

HENRY, J.  The defendant appeals from his convictions by a

Superior Court jury of unlicensed carrying of a firearm,

unlicensed carrying of a loaded firearm, possession of

ammunition without a firearm identification card, and assault by

means of a dangerous weapon (firearm).  He was acquitted of armed assault with intent to murder.[1]  On appeal the defendant argues that (1) his confrontation rights were violated by the admission in evidence, for substantive purposes, of a witness's grand jury testimony and out-of-court identification of the defendant; (2) he was entitled to a required finding of not guilty on the charge he illegally possessed ammunition; (3) a lay witness was improperly permitted to give opinion testimony; (4) the judge improperly denied the defendant's motion for a mistrial; (5) an in-court identification should not have been admitted; and (6) a hearsay statement should have been excluded.  We affirm.

Background.  We summarize the evidence at trial, leaving additional details for discussion with the issues presented.  On April 11, 2012, Kayleigh Gagnon and Kaitlyn Bayrouty arranged to meet to fight each other.  By about 10:30 A.M., Gagnon had gathered her then boy friend, Leonard Starcher, and his best friend, the victim, Brandon Dunham, on Starcher's front porch in Fall River.  The victim and Bayrouty had previously been in a relationship, and had a child together.  Within a few minutes, Gagnon recognized a vehicle owned by Elizabeth Mello arrive and

---

[1] The trial judge allowed the defendant's motion for a required finding of not guilty on the charges of intimidation of a witness and assault by means of a dangerous weapon against Leonard Starcher.

park down the street. Bayrouty, the defendant, and his cousin, Ashley Cioe, exited from the vehicle and walked toward Gagnon, the victim, and Starcher. Two people remained in the vehicle: Mello and Bianca Rebello.

The victim ran toward the defendant's group; accounts conflicted as to whether the victim had a weapon and, if so, whether he had a metal pipe or stick. Gagnon and Cioe both testified that they heard a popping or pinging sound like a gunshot as the victim charged. As Cioe turned to look where the sound had come from, she saw the defendant put something in his back pocket. Cioe testified that on the ride to the scene the defendant had shown her a "pellet" or "BB" gun. However, she also admitted that she had told the grand jury that the defendant had a gun, and the gun was a revolver.

Bayrouty and Gagnon's yelling had drawn the attention of neighbors. Larry Dillon testified that from his window he saw a Caucasian male step out of an automobile, lift his hand to aim the gun he was holding, and shoot diagonally across the street. Jeannine Lund ran outside and saw a young Caucasian male pull something from his waistband. She immediately ran back into her home for safety and within seconds heard a pop and called 911. Neither neighbor could identify the defendant as the shooter, but the jury could observe whether the defendant appeared to be

a young, Caucasian male, fitting the general description of the shooter.

Bayrouty and Gagnon had come to blows but quickly separated after hearing a shot fired.  Bayrouty, the defendant, and Cioe then returned to Mello's vehicle.  As they drove away, Cioe saw the defendant stick his "BB gun" out the window and shoot it into the air.  Gagnon heard a popping sound as the defendant's group drove past her.  Dillon and Lund also reported hearing a second gunshot, identical to the first.[2]

The police arrived, and located the victim in a nearby house.  Blood was dripping from a small hole in the side of his chest that was about the size of "a peanut M&M."  He was transported to the hospital.  Police searched the scene of the shooting and found no bullet casings, metal pipes, or sticks.

Officer Brett Kimball spoke to Bayrouty and Cioe and, as a result of those conversations, Officer Kimball and several other officers went to the defendant's home on Plymouth Avenue in Fall River, that same day.  Officer Kimball met the defendant's mother, Robin Silvester, at the defendant's home and explained that they wanted to search the defendant's bedroom because they

---

[2] Larry Dillon testified that he saw the same Caucasian male fire a second shot from outside the vehicle, which gave rise to a defense claim that three shots may have been fired and that there may have been more than one gun.

"believed evidence was still in the house."  Silvester consented and led the officers to a back bedroom.

In the bedroom was a single twin bed and a television on a night stand.  The walls were lined with new baby furniture and other new baby goods that Silvester told Officer Kimball were from a recent baby shower for the defendant.[3]  During the search, the officers moved ceiling tiles and recovered a cellphone box that contained .22 caliber ammunition.  The bullets were tested by Fall River police Officer Luis Duarte, Jr., who was a certified police armorer for the Fall River police department; he determined that the ammunition was live.  Duarte also testified that .22 caliber bullets and BB gun pellets have a completely different shape.

The emergency room doctor, Jeffrey Feden, treated the victim and testified that the victim's wound was consistent with being shot or stabbed.  He explained that X-rays revealed a metal object that was consistent with a bullet lodged in the soft tissue below the victim's ribs.  Because the bullet was not life threatening, there was no need to remove it.  In addition, Feden opined that because the metal object was oval or oblong it was not consistent with a BB pellet, which is smaller and round.

---

[3] Rebello was in the third trimester of her pregnancy with the defendant's child.

On May 7, 2012, about a month after the incident, police received a tip that led them to a house on Bradford Avenue. Knocking brought no response, but police could see several males inside running into a bedroom in the home. The police entered and saw the defendant. He was arrested and gave his address as the Plymouth Avenue apartment where the ammunition had been found.

At trial the defense claimed that the defendant had only a BB gun and did not shoot the victim. Silvester testified that her daughter slept in the room where the bullets were found, not the defendant, who slept across the hall with his brother. Alternatively, the defendant claimed that he acted in self-defense.

Discussion. 1. Right to confrontation. a. Grand jury testimony. The defendant argues that the substantive admission of Bayrouty's grand jury testimony was improper because her lack of memory prevented him from effectively cross-examining her. The issue arose in the following manner. At trial in May, 2013, Bayrouty claimed that she had no memory of the events that occurred on April 11, 2012, but testified in some detail to the relationships between the participants involved in that encounter. In light of her testimony, and the prosecutor's request to introduce her grand jury testimony substantively, the judge interrupted the direct examination to conduct a voir dire

to determine if the grand jury testimony should be admitted on grounds that Bayrouty was feigning memory loss.[4]

During the voir dire, Bayrouty claimed that drugs had "robbed [her] memory" of the events on April 11, 2012, as well as her related grand jury testimony.  Bayrouty gave many details, however, related to a variety of other 2012 events. For example, she remembered going to a Chuck E. Cheese restaurant with her son for his birthday in July, 2012; she knew the defendant had written to her from jail on more than three occasions; she recalled receiving a telephone call that the victim, who was the father of her child, had been hurt during the April 11 incident; she remembered the name and address of the facility where her child had gone to daycare two and one-half years earlier; and she remembered that in April, 2012, the victim was dating a woman named Mary who lived in Swansea.

---

[4] Bayrouty testified before the grand jury in May, 2012. She said that on April 11, 2012, she drove with Mello, Cioe, and Rebello to pick up the defendant and then drove to Starcher's house to fight.  She parked the car and got out with Cioe and the defendant.  They walked toward Gagnon's group when the victim came around a corner with a two by four and charged the defendant, who was behind her.  As the anticipated fight erupted between her and Gagnon, she heard a gunshot behind her. Bayrouty, who had fallen to the ground, got up and returned to the car where the defendant was already waiting, and they drove away.  As they passed Starcher's house, Bayrouty heard a gunshot from inside the car and behind her, where the defendant was sitting.  She denied seeing a gun at any time during the incident.

At the conclusion of the voir dire, the judge found that Bayrouty was "feigning a lack of memory" and based this finding "in large part, not only on her demeanor, but on the fact that she has a detailed memory about other things in her life, but a complete lack of memory as to the incident which is [the] basis for this trial." The judge ruled that her grand jury testimony could be admitted substantively, concluding that it was not necessary that the defendant "be able to elicit every piece of favorable evidence that he wants to, in order [to satisfy the] right to cross-examination."

The grounds relied on by the judge correctly conformed with the principles set forth in Commonwealth v. Daye, 393 Mass. 55, 71-75 (1984), and Commonwealth v. Sineiro, 432 Mass. 735, 745 & n.12 (2000). "Generally speaking, Massachusetts has adhered to the traditional rule that prior inconsistent statements of a witness may be introduced at trial only for the purpose of impeachment." Commonwealth v. McGhee, 472 Mass. 405, 422 (2015), citing Commonwealth v. Bookman, 386 Mass. 657, 665 (1982). See Mass. G. Evid. § 801(d)(1)(A) (2016). "However, in Commonwealth v. Daye, [supra], as modified by Commonwealth v. Cong Duc Le, 444 Mass. 431, 432 n.3 (2005), this court deviated from the traditional rule, holding that prior inconsistent statements by a witness before a grand jury can be admitted as substantive evidence if certain conditions are met." McGhee,

472 Mass. at 422, citing Commonwealth v. Stewart, 454 Mass. 527, 533 (2009).  See Mass. G. Evid., supra.  In Sineiro, 432 Mass. at 745 & n.12, the court "extended the holding of Daye to include grand jury testimony of a witness who a trial judge determines is 'falsifying a lack of memory.'"  McGhee, supra at 423.[5]  Before a witness's grand jury testimony may be admitted under these principles, the judge must determine that (1) the witness's claimed lack of memory has been fabricated; (2) the testimony was not coerced, meaning the witness's statement must be clearly that of the witness rather than the interrogator; and (3) the witness is present at trial for cross-examination.  See Sineiro, supra; McGhee, supra.[6]  We review a judge's determination of whether a witness is fabricating loss of memory for an abuse of discretion.  See McGhee, supra.

_____

[5] "[T]he tendency of unwilling or untruthful witnesses to seek refuge in a claim of forgetfulness is well recognized. Hence the trial judge may be warranted in concluding under the circumstances the claimed lack of memory of the event is untrue and in effect an implied denial of the prior statement, thus qualifying it as inconsistent."  Sineiro, 432 Mass. at 742, quoting from 2 McCormick, Evidence § 251, at 117 (5th ed. 1999). "As this observation suggests, when a witness does not deny his probable cause testimony, nor its truth, but chooses to feign an inability to recall the testimony in an attempt to avoid giving evidence that might send another to jail, a judge should not be without recourse."  Sineiro, supra at 742-743.

[6] In addition to the three foundation requirements for admissibility of such evidence noted in the text, the Commonwealth also must present some additional evidence that corroborates the out-of-court testimony when it concerns an essential element of the crime.  See McGhee, 472 Mass. at 422-423.

Here, in making his determination, the judge was able to observe Bayrouty's demeanor and assess her credibility. The judge acted well within his discretion in finding that Bayrouty feigned memory loss with regard to the events of April 11, 2012. See McGhee, 472 Mass. at 423; Mass. G. Evid. § 104(a) (2016). Additionally, we discern no error in the judge's finding that Bayrouty's grand jury testimony was not coerced, as the judge noted that Bayrouty's grand jury testimony was entirely in her own words and that there were very few leading questions. See McGhee, supra.

Contrary to the defendant's claim on appeal that the third foundational requirement was not met, Bayrouty was available for cross-examination at trial and defense counsel cross-examined her skillfully. Specifically, the jury were able to observe Bayrouty's demeanor on the witness stand and to assess her credibility in light of her ability to remember details pertaining to her life but not those that had a bearing on the specific facts of this case. Defense counsel cross-examined Bayrouty regarding her daily heroin habit during the period in question and on the topic of her father's efforts to set up a doctor's appointment for the loss of memory it induced. See McGhee, 472 Mass. at 423. She admitted that she had sent a few letters to the defendant during the pendency of this case. When asked if it was her belief that the police did not believe what

she told them in the first statement she gave during her interview at the police department on April 12, 2012, she answered, "If I can recall, yes, but I really can't recall." She gave the same answer when asked if she was promised that she would not be charged if she told the truth. Bayrouty repeated the response when asked if the police had told her that they had spoken to fifteen other witnesses. She said, "If I can recall, yes," that she was scared when she was at the police station. Further questioning elicited an unqualified response that she wanted to go home that night, that she did not want to spend the night in the police station, and that she did not want to be arrested. When asked if she cooperated with police she answered, "If I can recall, yes," and when asked if she was charged, she said, "If I can recall, no." Bayrouty continued to answer defense counsel's questions regarding the incident, albeit with similar responses, including the following: To counsel's question, "[Y]ou told [the police] that you didn't see any bullets, correct?" she replied, "I want to say yes, but I don't really recall, but possibly." To counsel's question, "[Y]ou saw Lenny Starcher with an eighteen inch rebar pipe in his hand, correct?" she answered, "I believe he did, but once again, . . . I don't recall." Bayrouty unequivocally stated that the car was Mello's, not hers. More was not required.[7] See

---

[7] To the extent the defendant suggests that, while Bayrouty

Cong Duc Le, 444 Mass. at 438, quoting from United States v. Owens, 484 U.S. 554, 559 (1988) (The confrontation clause does not "guarantee a 'cross-examination that is effective in whatever way, and to whatever extent, the defense might wish'").

b. Videotaped identification. Upon his determination that Bayrouty was feigning memory loss at trial, the judge also allowed the Commonwealth to play for the jury a videotape of Bayrouty's second interview at the police station. The videotape was played during the testimony of Officer Kimball, who testified as to its accuracy; it showed Bayrouty selecting a photograph of the defendant from a photo array. The defendant objected at trial, and argues on appeal that, as with the introduction of the grand jury testimony, his confrontation rights were violated where he could not effectively cross-examine Bayrouty due to her memory loss.

was physically present at trial, that presence was insufficient to provide him with effective cross-examination, the argument confuses the situation discussed in Daye, 393 Mass. at 73, where a witness truly has no memory of the events underlying the grand jury testimony -- thus precluding "meaningful" cross-examination -- with that presented here, where the witness is feigning memory loss. In the latter situation, the Daye-Sineiro rule and the cases make clear that juxtaposing the witness's feigned lack of memory of a particular topic with the witness's other trial and grand jury testimony constitutes a constitutionally valid opportunity for cross-examination. See Sineiro, 432 Mass. at 742-743 & n.8; McGhee, 472 Mass. at 423. This case does not present the extreme situation at issue in Commonwealth v. Kirouac, 405 Mass. 557, 558, 562-564 (1989), where the six year old witness totally refused to cooperate on cross-examination and was deemed unavailable.

Regardless whether Bayrouty could remember at the time of trial her previous selection of the defendant's photograph from among an array displayed by police, the videotape of her extrajudicial identification is admissible substantively where, as here and as we have discussed above, Bayrouty was available for cross-examination. See, e.g., Cong Duc Le, 444 Mass. at 441; Commonwealth v. Spray, 467 Mass. 456, 470 (2014); Mass. G. Evid. § 801(d)(1)(C) (2016).

2. Sufficiency of the evidence -- possession. The defendant argues that his motion for a required finding of not guilty on the charge of illegally possessing ammunition should have been allowed because the evidence was insufficient to establish the element of possession. See generally G. L. c. 269, § 10(h). Because the ammunition was not found in the defendant's physical custody, the Commonwealth proceeded on a theory of constructive possession, which requires proof of "knowledge coupled with the ability and intention to exercise dominion and control" over the contraband. Commonwealth v. Brzezinski, 405 Mass. 401, 409 (1989), quoting from Commonwealth v. Rosa, 17 Mass. App. Ct. 495, 498 (1984).

Viewing the evidence under the familiar Latimore standard,[8] the jury could have found that the defendant lived in the

_____

[8] See Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979).

Plymouth Avenue apartment with his mother.  The jury also could have found that his mother directed police to his bedroom, which the lone twin bed suggested he shared with no one.  The newly purchased baby supplies further suggested it was the defendant's bedroom, as his mother described the baby items as gifts from a recent shower for him and Rebello.  Because this evidence indicated that the defendant had a "particular relationship" to that bedroom, the jury could find that the ammunition found in the ceiling of that room belonged to him.  Commonwealth v. Rarick, 23 Mass. App. Ct. 912, 912 (1986).  Compare Commonwealth v. Montanez, 410 Mass. 290, 305-306 (1991) (constructive possession found where drugs were concealed in ceiling of common hallway immediately outside defendant's apartment and were packaged in "paper folds" similar to those found in his apartment, providing the necessary incriminating link to tie the defendant to the contraband).  Moreover, additional evidence linked the defendant to the ammunition.  The evidence showed that the defendant left from his home with a gun to participate in a fight in which he shot a man.  That the defendant carried and discharged a loaded weapon further supports a rational inference that the live ammunition found in the ceiling of his bedroom belonged to him and that he had the intention and ability to exercise control over that ammunition.

3. _Lay opinion_. Next, the defendant argues that Dillon improperly gave an opinion when he testified that the sound he heard when he saw the weapon discharged was "like a .22." The Commonwealth contends that Dillon's hunting experience and weapons training permitted the judge implicitly to qualify him to give an opinion regarding the caliber of the bullet he heard fired. See _Commonwealth_ v. _Sturtivant_, 117 Mass. 122, 133 (1875) (a witness "may state his opinion in regard to sounds, their character, from what they proceed, and the direction from which they seem to come"). See also, e.g., _State_ v. _Fisher_, 171 N.C. App. 201, 214 (2005), cert. denied, 361 N.C. 223 (2007). Our decision, however, rests on other grounds.

We are satisfied that, even assuming the admission of the testimony was error, it "did not influence the jury, or had but very slight effect." _Commonwealth_ v. _Flebotte_, 417 Mass. 348, 353 (1994). The testimony added little weight to the strong proof adduced at trial that the defendant shot the victim and, as noted above, possessed the ammunition. Proof of the specific caliber of the bullet was not an element of any offense with which he was charged.

4. _Mistrial_. The defendant argues that his motion for a mistrial should have been allowed to cure the prejudice that stemmed from Bayrouty's arrest in the court house. Upon the completion of her testimony, Bayrouty walked out of the court

room, whereupon she was arrested in the hallway and charged with perjury. The victim, who was sitting on a bench outside the court room, saw Bayrouty's arrest and was then immediately called into the court room to testify. Meanwhile, as Bayrouty was being escorted downstairs in the elevator, she admitted to police that she had lied and that she did have a memory of the events. According to Bayrouty, she lied because she was being threatened by the defendant's family.

The next morning, after the judge learned of Bayrouty's arrest, he raised two concerns. First, whether the jury should be told that Bayrouty admitted to lying on the stand and second, whether her arrest in front of the victim caused him to slant his testimony in favor of the Commonwealth. The judge gave the parties the weekend to consider the concerns.

The following Monday, the judge indicated that his concerns were exacerbated by the fact that immediately upon being called to testify, the victim had asked for time to consult with his attorney. In addition, the judge put on the record that the previous Friday, when the victim finished testifying, the judge asked him to remain where he was until the jury left, with the unexpressed intention of calling the court officers to escort him from the building to make sure there was no trouble. The judge reported that, as soon as the jury had exited, the victim looked at the judge, "appeared very frightened[,] and asked the

question, 'Am I in trouble?'" Also on Monday, the judge asked

the victim's attorney if the victim would return to the court

house so the defendant could be afforded an opportunity to

cross-examine him on any bias that may have developed as a

result of witnessing Bayrouty's arrest. The victim's lawyer

told the judge that the victim was not available.[9]

Following the above-described events, the defendant moved

for a mistrial. The judge denied the motion but took other

remedial steps. The judge stated he would permit the defendant

to put Bayrouty's confession of perjury in evidence through one

of the officers to whom she confessed, and he struck the

victim's testimony in its entirety, including his identification

of the defendant's photograph.[10] The defendant argues that

---

[9] The victim was a reluctant witness whose presence had to be secured with a bench warrant and his participation insured by being held in jail until he was called as a witness. He also received a grant of immunity after the judge determined that he had a valid basis for asserting his right against self-incrimination. When his attorney indicated that the victim was not available for additional questioning, it presumably signaled to the trial judge that trying to obtain his presence in the court room would likely take significant resources and time. In fashioning a remedy, the judge could properly consider this information in the calculus of insuring that the case move forward in a fair and timely fashion. See Commonwealth v. Cruz, 456 Mass. 741, 748 (2010) ("A trial judge should give due weight to concerns about judicial economy and the avoidance of delays that do not measurably contribute to the resolution of a particular controversy") (quotation and citation omitted). Accord Commonwealth v. Pena, 462 Mass. 183, 190 (2012).

[10] The victim had testified that he saw a group, including Bayrouty and a male whom he did not know, approaching Starcher's

neither remedy was sufficient to cure the prejudice and that his motion for mistrial should have been allowed.

It has long been established that "[a] trial judge retains broad discretion in deciding whether to declare a mistrial, and this court should defer to that judge's determination of whether [there was] prejudicial error, how much any such error infected the trial, and whether it was possible to correct that error through instruction to the jury." Commonwealth v. Amran, 471 Mass. 354, 359 (2015), quoting from Commonwealth v. Thomas, 429 Mass. 146, 157 (1999). Here, the judge properly weighed these factors. The judge carefully considered Bayrouty's admission that she lied and crafted a remedy that permitted the defendant to put this information before the jury. In striking the victim's testimony, the judge properly considered that the defendant had been foreclosed from cross-examining the victim regarding his motive to curry favor with the Commonwealth. The judge further reasoned that, because the victim had not made an in-court identification of the defendant and had only identified a photograph that had not yet been published to the jury, the jury would be capable of following the judge's instructions not

---

house, and that he (the victim) approached the group with a piece of wood in his hand. When he saw the male's hand make a small movement toward his pocket, he turned and ran in the opposite direction and was shot. He identified the defendant from a photo array, but that photo was not published to the jury.

to consider the victim's testimony.[11]  The judge did not abuse his substantial discretion.  See Amran, 471 Mass. at 360 ("A trial judge is in the best position to determine whether a mistrial, an extreme measure available to a trial judge to address error, is necessary, or whether a less drastic measure, such as a curative instruction, is adequate").[12]

In addition, striking the victim's testimony, which identified the defendant as the shooter, obviously benefited the defendant.  Moreover, we agree with the trial judge's assessment that the jury were capable of setting aside the victim's somewhat bland and equivocal testimony.  See Commonwealth v. Watkins, 425 Mass. 830, 840 (1997) ("We presume that a jury follow all instructions given to it").

---

[11] Before closing arguments, the judge carefully instructed the jury as to why he was striking the victim's testimony from the evidence.  The defendant did not object.  The judge told the jury that "[t]here was certain information which the Commonwealth should have provided to the [d]efendant in regard to [the victim] and it wasn't done in time for the [d]efendant to use that information and the information would have perhaps affected your assessment of [the victim's] testimony, and as a result, . . . the [d]efendant did not have an opportunity to present that information to you and you are not in a position to fairly assess [the victim's] testimony."  The judge then struck the victim's testimony and instructed the jury that they must "totally disregard [the victim's] testimony."

[12] The defendant claims that Cioe was similarly tainted by Bayrouty's arrest and that this provides an additional basis for requiring a mistrial.  The claim is unpersuasive where the record is devoid of evidence that Cioe was aware of the arrest.

The defendant's argument that he was deprived of the right to cross-examine Bayrouty about lying because of her right against self-incrimination is unavailing. The defendant made a strategic choice not to avail himself of the alternative remedy of putting Bayrouty's confession of perjury in evidence through one of the officers to whom she confessed. More importantly, the defendant benefited from Bayrouty's purported lack of memory surrounding the events, while simultaneously being able to suggest that her incriminating statements were merely offered to keep herself out of jail.

5. In-court identification. The defendant relies on the rule announced in Commonwealth v. Collins, 470 Mass. 255 (2014), to argue that it was error creating a substantial risk of a miscarriage of justice to admit Gagnon's in-court identification of the defendant where she twice failed to identify the defendant from a photo array on the day of the incident.[13] See id. at 265 (where a witness participated in a nonsuggestive pretrial identification procedure that produced "something less than an unequivocal positive identification," in-court

---

[13] At the time of this trial, before the issuance of Collins and Commonwealth v. Crayton, 470 Mass. 228 (2014), an in-court identification was generally excluded "if, in the totality of the circumstances, it was tainted by an out-of-court confrontation . . . that [was] so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Commonwealth v. Bastaldo, 472 Mass. 16, 31 (2015) (quotations and citations omitted).

identification ought to be permitted only where there is "'good reason' for it"), expanding on the holding in Commonwealth v. Crayton, 470 Mass. 228, 241-242 (2014); Commonwealth v. Bonnett, 472 Mass. 827, 836 (2015).  Pretermitting the question whether the prospective Crayton-Collins rule[14] is applicable to the case at bar, Gagnon's identification of the defendant, even if error, did not create a substantial risk of a miscarriage of justice. See Commonwealth v. Alphas, 430 Mass. 8, 13 (1999) (unpreserved claims of error are reviewed for a substantial risk of a miscarriage of justice).  Gagnon's testimony was merely cumulative of Cioe's unassailable identification of her cousin, the defendant, as the only male who accompanied her group to the fight.

6.  Hearsay.  Finally, the defendant argues that the judge erred in permitting Officer Kimball to offer hearsay testimony, over objection, that Cioe told him after the shooting that the defendant "wanted her to take the gun and she said no."  The testimony was not offered for its truth, but rather elicited as a prior inconsistent statement.  The judge properly limited the evidence to assessing Cioe's credibility.  There was no error.[15]

---

[14] See Collins, 470 Mass. at 265 ("[A]s in Crayton, this new rule shall apply prospectively to trials that commence after issuance of this opinion").

[15] At oral argument the defendant withdrew his argument that Dillon's testimony that he told an officer the "low

See Commonwealth v. Basch, 386 Mass. 620, 623 (1982).  See generally Mass. G. Evid. § 613(a) & note (2016) (extrinsic evidence of prior inconsistent statement by witness called by adverse party admissible for impeachment purposes).  Regardless, this testimony was cumulative, as the same witness already testified that the defendant brought a gun of some sort to the fight.

Judgments affirmed.

---

caliber . . . probably didn't . . . have shell casings" was hearsay.