NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-154

COMMONWEALTH

vs.

MICHAEL CEPEDA.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

A Superior Court jury convicted the defendant of assault and battery by means of a dangerous weapon and assault by means of a dangerous weapon based on a theory of joint venture.[1]  The defendant appeals, arguing among other things that the evidence was insufficient to prove that he knew that his coventurers were armed with dangerous weapons (specifically, firearms) or that he shared the intent to use the firearms.  We agree and thus reverse the judgments of conviction.

Background.  We summarize the evidence, and the reasonable inferences to be drawn therefrom, in the light most favorable to the Commonwealth.  See Commonwealth v. Latimore, 378 Mass. 671, 676-77 (1979).  Between 11 and 11:30 P.M. on April 27, 2019,

_____

[1] The jury acquitted the defendant of armed assault with intent to murder.

Juliana Alcantara and her stepbrother, Wasley Paulino, arrived at a party in Lynn. The defendant arrived shortly thereafter with codefendants Deylis Encarnacion and Geraldo Rojas.[2] Paulino's friend, Emmanuel Bello, was also at the party.

Sometime after midnight the party came to an abrupt end when the fire alarm went off. Bello left the area in his car but returned when Paulino, at Rojas's urging, called him for a ride. Bello parked his car a short distance from the building, and Alcantara and Paulino walked to meet him. Encarnacion, Rojas, and two other men followed. The defendant walked in the other direction to put what looked like audio equipment into a car parked across the street, but ran over seconds later to join the group following Alcantara and Paulino.

Precisely what occurred next was the subject of conflicting testimony at trial and before the grand jury.[3] Alcantara testified at trial that she was sitting in the rear passenger-side seat of Bello's car when she heard Paulino say, "Not here,

_____

[2] Encarnacion was tried jointly with the defendant and was convicted of armed assault with intent to murder, assault by means of a dangerous weapon, assault and battery by means of a dangerous weapon, and carrying a firearm without a license. Rojas was tried separately and was convicted of a single charge of carrying a firearm without a license. He was acquitted of armed assault with intent to murder, assault by means of a dangerous weapon, and assault and battery by means of a dangerous weapon.

[3] As discussed further below, certain grand jury testimony was admitted as substantive evidence at trial.

2

my sister is in the car."  The man to whom Paulino was speaking was standing next to the rear passenger-side door, while another man was pulling on the driver's door handle and telling Bello to "get out of the car."  Alcantara then heard three gunshots.  One shot hit her in the hand, and a second grazed her chin.  Although Alcantara never saw a gun, she identified the shooter as the man who had been standing by the passenger-side door.

Paulino and Bello recalled the events somewhat differently in their grand jury testimony.  Paulino testified before the grand jury that the defendant, Encarnacion, Rojas, and another man "surrounded the car" after Alcantara had gotten in.  Paulino heard Encarnacion tell the defendant, "[G]o in front and try to open the door."  At some point both Encarnacion, who was standing behind the car, and Rojas, who was standing on the passenger side, took out guns and fired toward the car.  As Paulino described the sequence of events, "they surrounded the car and started taking out weapons.  I said, my sister is in the car. . . .  Michael [the defendant] wanted to open the door, and then he was kind of in shock,[4] so [Bello] accelerated, and that's when they shot."

---

[4] Defense counsel argued in closing that "he" referred to the defendant as the one in shock.  Conversely, the prosecutor argued that "he" referred to Bello.

Bello testified before the grand jury that four people "started surrounding [his] car" but the only ones he could see clearly were Encarnacion and a man with a pierced nose. Contrary to Paulino's account, Bello recalled that Encarnacion was standing in front of the car when he pulled out a gun and pointed it at him. The man with the pierced nose was trying to open Bello's door,[5] but Bello did not specify whether this was before or after Encarnacion pulled out the gun. When Bello started to drive away, Encarnacion "went to the side" and shot twice into the car.

Immediately after the shooting, surveillance video captured a group of five people fleeing the scene in the car that the defendant had placed equipment in earlier. About three weeks later, both Paulino and Bello identified the defendant from a photographic array as the person who tried to open Bello's door on the night of the shooting.

Discussion. The defendant's arguments on appeal center on the admission of Paulino's and Bello's grand jury testimony. The issue arose in the following manner. After the judge issued bench warrants compelling Paulino and Bello to appear at trial, they both testified to events leading up to the shooting but

_____

[5] Bello initially testified that the man with the pierced nose had a "weapon" but, when asked whether the man had a "gun," replied that he "didn't see."

4

claimed not to recall the shooting itself.  Following voir dire examinations, the judge found that both witnesses were feigning memory loss and allowed the Commonwealth to admit portions of their grand jury testimony substantively as prior inconsistent statements.

On appeal the defendant challenges the judge's rulings on the ground that the admissions of the grand jury testimony deprived him of a meaningful opportunity for cross-examination, in violation of his right to confrontation.  He also argues that uncorroborated grand jury testimony cannot be the sole source of support for an element of the crime and that the Commonwealth presented no other evidence that he knew that either Encarnacion or Rojas was armed.  While it appears that there was no confrontation clause violation, see Commonwealth v. Figueroa, 451 Mass. 566, 576-77 (2008); Commonwealth v. Silvester, 89 Mass. App. Ct. 350, 357 n.7 (2016), we need not decide that issue, or whether the Commonwealth presented adequate corroboration, because we agree with the defendant's alternative argument that, even considering the grand jury testimony, the evidence was insufficient to sustain the convictions.

Because the Commonwealth proceeded on a joint venture theory, it had to prove that the defendant "knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense."

5

*Commonwealth* v. *Zanetti*, 454 Mass. 449, 466 (2009). Where the crime charged has possession of a weapon as an element, the joint venturer must have "had knowledge that the principal perpetrator had a weapon." *Commonwealth* v. *Ellis*, 432 Mass. 746, 762 (2000).

Here, the evidence does not support a finding beyond a reasonable doubt that the defendant acted together with Encarnacion and Rojas knowing that either had a gun and sharing their intent to use one. There was sufficient evidence that the defendant was at the scene and tried to open Bello's door while the other men surrounded his car. But in the face of vague and conflicting witness testimony, the jury could only speculate that the defendant knew that his coventurers were armed. There was no evidence that the defendant had such knowledge prior to approaching Bello's car. And although the prosecutor argued in closing that the defendant tried to open Bello's door "after [Encarnacion] show[ed] the weapon," none of the witnesses provided a clear timeline to that effect. Moreover, the witnesses' accounts differed on facts bearing on the defendant's knowledge and intent, such as which of the men were armed, who fired the shots, and where the shooter or shooters were standing in relation to the defendant. It was an impermissible inferential leap for the jury to conclude from this evidence that the defendant knew prior to the shooting that his

6

coventurers had guns and intended to use them.  See Commonwealth v. Walsh, 407 Mass. 740, 743-745 (1990) (jury could only have speculated that defendant knew of and shared coventurer's intent to stab victim where, although defendant was present at scene of attack, there was no evidence he knew coventurer was armed until after stabbing occurred); Commonwealth v. Clark, 363 Mass. 467, 473 (1973) (jury could not have inferred that defendant knew of and shared intent to use gun produced by coventurer during drug deal, where there was no evidence that defendant knew beforehand that coventurer had gun and intended to use it).

We are not persuaded by the Commonwealth's contention that other circumstantial evidence demonstrated the defendant's knowledge of and shared intent to use a gun during the commission of the crimes.  Specifically, the Commonwealth points to the significant amount of time that the defendant spent with Encarnacion and Rojas at the party, their joint flight from the scene, and the identification of the defendant as the person who tried to open Bello's door.  None of this evidence demonstrates that the defendant knew that Encarnacion or Rojas had a gun or that he took some step to help carry out their intent to use a gun during the assault.  While the evidence relied on by the Commonwealth established a possibility that the defendant had the requisite knowledge and intent, it did not allow the jury to find those elements beyond a reasonable doubt.  See Commonwealth

7

v. Gonzalez, 475 Mass. 396, 417-418 (2016); Walsh, 407 Mass. at 744-745.[6]

The judgments are reversed, and the verdicts are set aside. Judgment shall enter for the defendant.

So ordered.

By the Court (Rubin, Blake & Shin, JJ.[7]),

Assistant Clerk

Entered: March 4, 2024.

---

[6] We decline to exercise our inherent authority to order entry of judgments of conviction on the lesser included offenses of assault and assault and battery because we are unable to conclude that "the remaining untainted elements include all the elements of [the] lesser included offense[s]." Commonwealth v. Garrett, 473 Mass. 257, 266-267 (2015). We note that the Commonwealth has not requested this alternative relief.
[7] The panelists are listed in order of seniority.

8